## THE BOUKER NO. 2.

### (Circuit Court of Appeals, Second Circuit.    November 13, 1918.)

### No. 51.

1. COLLISION ⬤⟶107—SPECIAL CIRCUMSTANCES—RULES.

   A steamer, backing out of her slip, preparatory to getting on her definite course, is governed by the special circumstance rule (article 27 of June 7, 1897 [Comp. St. § 7901]), and not the starboard hand rule.

2. COLLISION ⬤⟶102, 144—FAULT—LIABILITY—DIVISION OF DAMAGES.

   A tug, which backed from her slip without giving the usual warning signal, *held* at fault for a collision with another tug, while the second tug was also at fault for coming down too close to the line of piers, and hence damages for the resulting collision should be divided; it appearing that the failure of the vessels to maintain lookouts was immaterial, as neither could have seen the other in time to have avoided the collision.

Appeal from the District Court of the United States for the Eastern District of New York.

Libel by Thomas Flannery against the steam tug Bouker No. 2, her engines, etc., claimed by the Bouker Contracting Company. From a decree for libelant, claimant appeals. Reversed and remanded, with directions to enter decree for half damages.

Park & Mattison, of New York City (Samuel Park, of New York City, of counsel), for appellant.

Foley & Martin, of New York City (William J. Martin and George V. A. McCloskey, both of New York City, of counsel), for appellee.

Before WARD, HOUGH, and MANTON, Circuit Judges.

WARD, Circuit Judge. July 28, 1915, a little after 3 p. m., the tide running flood and the weather clear, the tug Bouker No. 2, backing out of the slip between Piers 22 and 23 on the Brooklyn side of the East River came into collision with the tug Thomas A. Quigley, bound down the river to the slip between Piers 23 and 24; the fantail of the Bouker striking the port side of the Quigley. The District Judge for the Eastern District of New York found the Bouker solely at fault, and this is an appeal from his decision.

[1] He fell into one plain error in supposing that the starboard hand rule applied to the Bouker, saying:

"The ordinary rule requiring boats to pass port to port, the starboard hand rule as to boats upon crossing courses, and the rules as to indication of intended navigation by whistle signals, all make it apparent that if the Bouker backed out at high speed, so as to come in collision while the Quigley was passing down the river and still maintaining about that same distance from the piers, responsibility would rest upon the Bouker. * * * The starboard hand rule would control the movements of the Bouker, if she was intending to back out into the river a sufficient distance to place her upon a crossing course, and that intention should be indicated by a whistle signal, for the protection of any boat which might properly be approaching. But if the Bouker was intending to turn up the East River, and thus to observe the port to port passing rule with any boat coming down, the burden was upon the Bouker to approach the corner at such a rate of speed as not to come in collision with any boat which might be

─────────────────────────────────────────────

⬤⟶For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

properly along the Brooklyn shore at that point. The Bouker must therefore he held responsible primarily in this case."

The rule does not apply to a steamer backing preparatory to getting on her definite course, whether it be up or down the river. The situation of steamers maneuvering to get on their definite courses is covered by the special circumstance rule. Article 27, Act June 7, 1897, c. 4, § 1, 30 Stat. 102 (Comp. St. § 7901). This was flatly decided by the Supreme Court in the case of The Servia and The Noordland, 149 U. S. 144, 156, 13 Sup. Ct. 877, 37 L. Ed. 681, which we have consisttently followed. See our own cases: The John Rugge, 234 Fed. 861, 148 C. C. A. 459; The William A. Jamison, 241 Fed. 950, 154 C. C. A. 586.

[2] Pier 22 is covered within a short distance of the end, so that a tug backing out would not be seen until nearly out of the slip by one coming down the river, nor would she any sooner see the tug coming down. It is quite evident to us that the collision was unavoidable when the tugs did see each other. Although the Bouker was backing out slowly, and immediately put her engines full speed ahead, and the Quigley blew a signal of one blast of her whistle, an alarm, and hardaported, the tugs came together. The judge found that the Bouker did not blow the usual slip whistle, and we accept his finding on this point, which puts her at fault; but we think the Quigley was also at fault for coming down too close to the line of the piers, in violation of the maritime requirements of ordinary prudence. It is not necessary to decide whether the East River statute (chapter 410, § 757, Laws 1882) applies to the locality. If the Quigley had been out, as her witnesses say, from 200 to 300 feet from the line of the piers, she could easily have avoided the Bouker by porting, so easily that she could hardly have escaped sole liability. The District Judge also found the Bouker at fault for want of a lookout at the stern. The absence of a lookout forward on the Quigley is admitted. However, we think the absence of lookouts, or of vigilant lookouts, had nothing whatever to do with the collision. The vessels were first visible to each other when too near to go clear. The Bouker is at fault for not advising the Quigley of her movements by the usual slip whistle, and the Quigley for coming down at full speed too close to the line of the piers.

The decree is reversed, with costs, and the cause remanded to the District Court, with instructions to enter the usual decree for half damages.