### THE EDOUARD ALFRED.

(District Court, E. D. New York. October 22, 1919.)

1. COLLISION ⊕═96, 106—NAVIGATION RULES; VESSEL LEAVING SLIP.

Boats maneuvering to leave a slip are not navigating on a course, within the starboard hand crossing rule, until they have proceeded far enough away to definitely indicate their intended course, and until that time the special circumstance rule applies.

2. COLLISION ⊕═102—VESSEL LEAVING SLIP; MUTUAL FAULTS.

A collision in East River between a steam lighter leaving a slip and a tug navigating along the ends of the piers *held* due to faults of both vessels; the lighter being in fault for not keeping a better lookout, and not continuing its slip signal until it reached the end of the pier, and the tug for not reducing speed at once on accepting a crossing signal, which made the lighter the privileged vessel.

In Admiralty. Suit for collision by the Empire Water Company, Incorporated, owner of the steam lighter Livingston, against the steam tug Edouard Alfred. Decree for libelant for half damages.

Foley & Martin, of New York City (J. A. Martin, of New York City, of counsel), for libelant.

Kirlin, Woolsey & Hickox, of New York City (L. De Grove Potter, of New York City, of counsel), for claimant.

CHATFIELD, District Judge. On the morning of October 7, 1918, the steam lighter Livingston, 81 feet over all and 25 feet wide,

which had been lying overnight some 400 or 500 feet in from the end of the pier at Thirty-First street, Brooklyn, started for Pier 8, Hoboken. This pier extends diagonally into the wide stretch of water where Gowanus Canal emerges into New York Bay. There are several hundred feet of clear water between the end of the pier and boats moored at the wharves upon the opposite side of the creek. The Livingston apparently blew a whistle which was intended as a slip whistle, and headed straight out parallel to the north side of the pier, and at a distance which ultimately proved not much more than 25 feet therefrom. In so doing she passed around a derrick lighter which had been lying between the Livingston and the outer end of the pier. Her pilot house was located some 60 feet back of the bow, and she had no lookout, except the man stationed in the pilot house. As the pilot house cleared the end of the shed upon the pier (which is No. 18, East River), the boat was making some 3 or 4 miles an hour.

The captain in the pilot house then observed the Edouard Alfred, a tug boat, coming up the Gowanus Canal, and approaching the shore, so that she was not much over 100 feet out, and slightly below the line of the southerly side of Pier 18. The Livingston blew one whistle, followed by another single whistle, and then by an alarm. The Edouard Alfred made no change in speed or course, so far as observed by the Livingston, which continued her course and speed straight across the bow of the Edouard Alfred. The Livingston, whose stern at the time the boats sighted each other, was some 80 feet *inside* the end of the pier, proceeded to a point where her stern was 80 feet *outside* of the pier, or a total distance of about 160 feet, when the bow of the Edouard Alfred struck her at a point estimated by the witnesses as 100 feet outside the end of the pier and about 20 feet forward of the Livingston's stern. As the width of Pier 18 is also about 100 feet, and as the collision occurred about 25 feet up the channel (that is, to the northeast of the northerly line of the pier), it is apparent that the Edouard Alfred traveled about the same distance as the Livingston. At the time of the collision the Edouard Alfred had her engines reversed and her helm ported; but the way of the Edouard Alfred had not been stopped, nor had her course been sufficiently diverted to starboard to carry her under the stern of the Livingston.

No question arises as to signals. The single whistle of the Livingston was accepted by the Edouard Alfred, and the captain of the Edouard Alfred, as well as all of its witnesses, testifies that the Edouard Alfred ported her helm and attempted to pass astern of the Livingston, except as this maneuver was interfered with by the reversal of the engines of the Edouard Alfred when danger of collision was observed. We thus have a situation where the Livingston assumed (and indicated by whistle signal) right of way across the bow of the Edouard Alfred. This was acquiesced in by the Edouard Alfred, which proceeded too far before beginning to hold back or before turning to starboard, so as to give the Livingston the right of way which admittedly belonged to her.

[1] If the accident had occurred under the same circumstances in the bay, with the boats emerging from behind some obstructing ob-

ject, such as a large steamer, it is certain that the Edouard Alfred would be the burdened vessel, as they were approaching on crossing courses, and as the Edouard Alfred had the Livingston upon her starboard hand. In the case at bar, however, the Livingston was not navigating in open water, and in recent cases, such as The Bouker No. 2, 254 Fed. 579, 166 C. C. A. 137, and Moran and Coleraine, 254 Fed. 766, 166 C. C. A. 212, the Circuit Court of Appeals had held that boats maneuvering to leave a slip are not navigating upon a course until they have proceeded sufficiently away from the slip to have definitely assumed the course upon which they are to move away from the locality. The Court of Appeals in each of these cases held that the special circumstance rule applies, that the boat having the other upon her starboard hand is not necessarily the burdened vessel, and has in each case held both vessels responsible for failure to avoid danger, where greater care would have prevented collision.

[2] Assuming that the Livingston, in leaving the slip in question, was therefore not a vessel upon a course, and as the Edouard Alfred was approaching at about the same rate of speed as the Livingston was moving out, let us consider the situation under the special circumstance rule. The Edouard Alfred claims that the Livingston was too close to the side of the slip, and did not blow a slip whistle. This, in effect, comes down to a charge that the Livingston did not continue blowing a slip whistle, so as to attract the attention of the Edouard Alfred as the Livingston approached the end of the pier. The evidence seems to show that the Livingston blew a whistle as she started to leave the slip. She. had ceased to blow this whistle before her master observed the Edouard Alfred coming up the stream; that is, before her bow had emerged from the slip. She immediately thereafter blew a one-whistle signal, and this the Edouard Alfred accepted.

There is little reason for disbelieving the testimony of the witnesses who testify that the Livingston had blown a signal which was substantial compliance with the slip whistle rule. The Edouard Alfred was complying with the narrow channel rule; that is, she was to starboard of midstream, but had reached a point close to the ends of the piers. There were no other boats in the neighborhood, interfering with the movements of either vessel. The Edouard Alfred must have made some way to starboard when her helm was ported, and was not so close to the pier end as to interfere with her own steerageway; but she was too close to the pier ends to enable the Livingston to have a free choice in selecting a course upon which she would proceed toward Hoboken. Undoubtedly the Livingston could do but one thing, and that was to proceed across the Edouard Alfred's bow, and indicate to the Edouard Alfred that she was going to do so.

The Edouard Alfred claims that the Livingston was negligent in failing to increase her speed, so as to gain the necessary 20 feet by which the Edouard Alfred ultimately failed to clear the Livingston's stern. The Edouard Alfred also contends that the Livingston knew that the Edouard Alfred was a slow, clumsy boat in maneuvering. But the court is unable to find that the Livingston was at fault for not appreciating the fact that the Edouard Alfred would be unable to turn suf-

ficiently to starboard and to stop her course a sufficient amount to make the Livingston's escape so near that the added impetus of hooking up the engines while going 150 feet would be necessary. In fact, the Livingston could hardly appreciate this until just before the collision, and it would then be too late to accomplish anything by attempting to proceed under a jingle.

On the other hand, the Edouard Alfred may fairly be held to have failed to appreciate the distance which the Livingston would cover and the rate of approach of the two vessels, inasmuch as the Edouard Alfred struck the Livingston a severe blow, after having covered more than the distance within which some witnesses testify that the Edouard Alfred could be stopped. She apparently had made no progress at all toward shore, even under a helm put to port for that very purpose. The Edouard Alfred accepted the position of the burdened vessel; but it is not believable that under such circumstances so little diminution of speed and change of course could have resulted, if she had promptly observed the danger. Neither boat had a lookout stationed directly at the bow, but the captain of the Edouard Alfred claims that he saw the Livingston at about the time her bow actually came out from behind the pier and her pilot house showed in front of the pier shed. The absence of a lookout on the Edouard Alfred, therefore, made no difference in the situation.

The Livingston had men working upon its deck, but no one standing at the bow. The height of the Livingston was such that a lookout on the deck could have signaled the approach of the Edouard Alfred (which might have been in that position legitimately without being open to the charge of running in close under the pier heads), and could have warned the Livingston to slacken its speed. As it was, the bow of the Livingston reached the end of the pier before the captain reached a point where he could determine what course to pursue. The lack of lookout, therefore, upon the Livingston, while perhaps customary upon such boats, should not be treated as an excuse for failure on the part of its captain to use such precautions as, would make up for the lookout. The presence of the lookout would undoubtedly have resulted either in a slackening of speed on the part of the Livingston, if the vessels were in fact so close to each other that the collision was unavoidable, or would have allowed the earlier sounding of a whistle, if the position of the vessels, at the time the first single whistle signal was given, was such that the collision could not be avoided. But, even so, there was additional negligence with respect to the slip whistle. The Livingston, apparently, had ceased blowing her slip whistle before getting near the end of the pier, while the Edouard Alfred did not listen carefully for all whistles, or she would have noticed the Livingston's whistle, even though blown when well up the slip, and thus might have been more careful in running along the pierheads.

It would follow that the Edouard Alfred was clearly at fault for her conduct throughout the entire proceeding; but the Livingston was at fault as well, and it would appear to be a case where the damages should be divided, and a decree may be entered accordingly.