## THE PROGRESSIVE.

## THE SLATINGTON.

(Circuit Court of Appeals, Second Circuit. January 12, 1921.)

### No. 100.

1. **Collision** ⊂⇒106—**Tugs, while maneuvering to get on course, governed by special circumstance rule.**

   The starboard hand rule does not apply to a tug backing preparatory to getting on her definite course; but such a situation of maneuvering a vessel is covered by the special circumstance rule, Inland Rules, art. 27 (Comp. St. § 7901).

2. **Collision** ⊂⇒95(7)—**Mutual fault of tugs for collision between tows.**

   Two tugs each *held* in fault for a collision between their tows at night in North River, while maneuvering preparatory to starting on their respective courses; one for not waiting in her slip until an interfering tug and tow were out of the way, and the other for not keeping a proper lookout.

Appeal from the District Court of the United States for the Southern District of New York.

Suit in admiralty for collision by Ida M. Flannery, owner of the barge Howe, against the steam tug Progressive; with the tug Slatington impleaded. Decree against the Progressive alone, and her claimant appeals. Modified, by holding both tugs liable.

Alexander & Ash, of New York City (Peter Alexander, of New York City, of counsel), for claimant-appellant.

Harrington, Bigham & Englar, of New York City (Leonard J. Matteson, of New York City, of counsel), for claimant-appellee.

Herbert Green, of New York City, for libelant-appellee.

Before WARD, HOUGH, and MANTON, Circuit Judges.

MANTON, Circuit Judge. The libelant is the owner of the coal barge Edward G. Howe, and filed this libel for damages sustained by her while she was in tow of the tug Progressive and when she came in collision with a railroad float in tow of the tug Slatington. The suit was commenced against the Progressive alone, and her owner brought in the Slatington by petition under the fifty-ninth rule of admiralty.

On the 20th of February, 1918, about 9 o'clock in the evening, a clear night, with the wind northwest strong, and tide strong ebb, and while in the North River off the New Jersey shore, and abreast of the entrance of the Morris Canal Basin, about midway between the Game Cock dock and the Lehigh Valley float bridges, the tows collided. The distance off the New Jersey docks is given as 400 to 1,000 feet. The tugs drew their tows out into the river and rounded to in an endeavor to get them on their respective courses and cut across towards the New York shore with a strong wind and tide. The Progressive, owned by the Newtown Creek Towing Company, was engaged to tow the Howe light from the Game Cock dock, Jer-

sey City, to the Erie Basin. The barge was lying on the south side of the dock outside of two other vessels, well up on the slip, and a Lehigh Valley tow of light barges, bound for South Amboy, lying across the end of the pier. The latter tow was arranged in three tiers, the first of which was fast to the end of the dock while the other tiers tailed down stream with the tide, across the mouth of the slip, leaving room for the tug to enter, but not enough for her to take her tow out into the river.

The Progressive went into the slip, bow toward the bulkhead, and met the Howe first alongside of her starboard side. She had to remain at rest until the way was clear for her to make her exit, and at about the same time the Lehigh Valley tug, the Genessee, picked up the light tow, which impeded her exit, on a hawser, and started for Perth Amboy, going up and across and around it, under a port wheel. The master of the Progressive stationed his mate on the stern of the Howe as a lookout, and blew his slip whistle, and backed out into the river under two bells. The effect of the ebb tide, acting upon the tug and tow as they emerged from the slip, turned their sterns down stream and carried them down to the Lehigh Valley float rack near by. The Progressive continued under sternway until the bow or inner end of the Howe was about 100 feet clear of the docks, when she was stopped and went ahead under one bell under a port wheel to straighten herself, and towed up the river below the tow of the Genessee. The lookout then stationed himself on the bow of the Howe, where he remained until the collision. While thus maneuvering, the Slatington took the railroad float from one of the Lehigh Valley float bridges about 500 feet below the Game Cock dock, bound for Pier 34, North River. The float was lying in her berth stern out.

The Slatington navigated into the river bow first, around a line from her own bow to the lower corner of the stern of the float, and backed out into the river until the inshore end of the bow of the float was about her own length clear of the float bridges. As she came into the tideway, the tide turned the stern of the tug and the stern of the float down stream. The float was carried from 325 to 350 feet down the river below the point of departure. The Slatington then went to the port down river side of the float, placed her bow against the float's port side near her stern, made fast with a headline, and shoved her around and up the river, until her stern was headed up stream and her bow down stream. It was intended that this be done preparatory to picking her up alongside, portside to portside, and towing her, stern foremost, to her destination.

The master of the Progressive says that, when the Progressive was under the port helm and got headed up stream, he saw the Slatington under his stern about 200 or 300 feet away, exhibiting to him her red and green lights, and that the Genessee was then a little above the Progressive in the river, and the tail tier in her tow was about 30 to 50 feet away. The Genessee had been heading up toward the middle of the river, and started to turn down and proceed on her voyage to Perth Amboy. The Progressive and the Howe were then between the two tows, with the Genessee above and the Slatington below.

The master of the Slatington says that he was just making fast to his float after pulling her out into the river and downward again to move the float forward when the collision occurred.

The judge below held the Progressive solely at fault and exonerated the Slatington. He applied the crossing course rule, holding that the Progressive, instead of awaiting a consent to her request to cross, went ahead, crossed the Slatington's bow, and that the starboard hand rule was violated. The Slatington undoubtedly, in turning her tow around stern up the river, moved her up stream a considerable distance. When she hauled the car float out from the float bridges, the tow was carried down stream by the tide a distance estimated at 350 feet, and the collision occurred about midway between the upper float bridge and the Game Cock dock. The Game Cock dock is about 500 feet above the bridges. The Progressive blew two whistles to the Slatington to allow her to go across her bow. She received no reply, and blew a second signal of two whistles, and received no reply, and crossed; but the danger of collision was then imminent, and she blew her alarm whistle, stopped, and backed, and her tow came in contact with the up-river end of the car float. When the vessels came together, the way went entirely off the float; but she was still moving slowly up stream. At the time of collision, it was apparent that the Progressive had ported her wheel, so that she was headed straight across the river and the Slatington was heading up stream.

[1] We think the court below should not have imposed liability upon the Progressive solely upon the ground that she violated the starboard hand rule. The maneuvers of the three tugs created a situation in their navigation which should be governed by the special circumstance rule. The starboard hand rule does not apply to a tug backing preparatory to getting on her definite course, whether it be up or down the river. But such a situation of maneuvering a vessel is covered by the special circumstance rule. Article 27, Act June 7, 1897, c. C–4, § 1, 30 Stat. 102 (Comp. Stat. § 7901); The Servia, 149 U. S. 144, 13 Sup. Ct. 877, 37 L. Ed. 681; The William A. Jamison, 241 Fed. 950, 154 C. C. A. 586; Bouker No. 2, 254 Fed. 579, 166 C. C. A. 137.

[2] We think that, if it be true that the Genessee interfered with the navigation of the Progressive, as related by the master of the Progressive, the Progressive was at fault in coming out of the slip when she did. She should have anticipated the handicap which would be hers by the presence of the Genessee preceding her out of the slip into the tideway. This was a situation which she could have perceived, and should have calculated in her navigation.

We think, further, that the Progressive's master was at fault in assuming that the Slatington was an overtaking vessel, and mistakenly blew a signal of two whistles, which was improper under the circumstances. Two inconsistent accounts of the happening of the collision are set forth in the answer of the Slatington. The original answer alleged:

"At 9 p. m., February 20, 1918, the tug Slatington pulled a Lehigh Valley car float from Bridge No. 6, Lehigh Valley Terminal, Jersey City, New Jersey,

271 F.—14

for the purpose of towing this float to Pier 34, North River. The weather was clear; the tide was ebb. To pull the float from the bridge, the Slatington placed a headline on the bumper end of the float. After making the line fast, the engines of the Slatington were reversed and she hauled the float out from the bridge. After the float had been hauled out into the stream, the ebb tide carried the stern of the Slatington and the bumper end of the float down the river. The Slatington then came ahead under a port helm, with her bow against the float, shoving the float around until the toggle end of the float was headed upstream. While the Slatington was executing this maneuver, her master observed a tug, which subsequently proved to be the Progressive, with a number of boats in tow on hawsers, leaving the Packer dock. The Packer dock is a short distance to the north of the Lehigh Valley float bridges. The Progressive with her tow then headed to the eastward across the toggle end of the Slatington's float. The Progressive was able to hold herself up against the ebb tide, but her tow was swept down the stream by the tide until the tow collided with the Slatington's float. So far as those on the Slatington could observe, no damage was done to the tow of the Progressive."

And the amended answer alleged:

"At 9 p. m., February 20, 1918, the tug Slatington proceeded to the Lehigh Valley float bridges, at Jersey City, N. J., for the purpose of towing Lehigh Valley carfloat No. 420 to Pier 34, North River. The weather was clear; tide strong ebb; wind from the northwest. The Slatington placed a headline on the outer or bumper end of float No. 420 and backed out clear of the pier heads with the float. The ebb tide carried the stern of the Slatington and the bumper end of the float down the river. The Slatington then came alongside the float, and proceeded to get out her towing lines in order to take the float in tow on the port side of the tug. While thus engaged in making the float fast, and while the engines of the Slatington were at rest, a tug with a hawser tow was observed coming out from the Packer dock into the stream. Another tug, which afterwards proved to be the Progressive, with the barge Edwin G. Howe in tow on her starboard side, was also observed coming out from Packer dock and heading downstream. Instead of holding well up from the Slatington and her tow, the Progressive recklessly endeavored to cross too close to the bows of float No. 420, and was swept down by the tide, until the barge Howe came into collision with the port forward corner of the float. No damage was done to float No. 420, and no damages to the Howe was observed."

These contradictions are worthy of note and must be considered, as well as the contradiction in the testimony of the master as to the maneuvering which he said took place on his part, when he said that, after hauling the car float clear of the piers, he put the bow of his tug against her port side near her bumper end or stern, and shoved her stern around from downstream to upstream, and that after pulling the car float clear of the float bridges. This is inconsistent with the claim and allegations of the answer that, after pulling the car float clear of the float bridges, the tug went ahead under a port helm and shoved the float around until her toggle end or bow was headed upstream. The master admits that he never saw the Progressive, and did not know that they were in the river until after he had shoved the stern of the tow upstream, at which time the Progressive was only 100 feet away from the upstream end of the float. It was thus apparent that there was a fault in the navigation of the Slatington in failing to have a proper and efficient lookout. If there was a floatman on the bow of the float, he should have reported the presence and proximity of the Progressive and her tow. If the master of the vessel was depending upon the floatman to report other vessels in the river, the fault

is clear, for the reason that the floatman, acting as a lookout, failed to perform his duty. A lookout properly stationed, attending to his duty, could at least have heard the whistles of the Progressive and reported to the master at the time the tows were 300 or 400 feet apart. If the master had been advised as to the situation, he might have averted the collision by blowing an answering signal and navigating accordingly or by stopping and backing. We think the Slatington was at fault.

Accordingly the decree will be modified, by holding both vessels liable.