## THE S. A. CARPENTER.

## THE TUXEDO.

(District Court, E. D. New York. July 16, 1921.)

Collision ⬅102—Passing schooner and ferryboat leaving slip.

    A collision between a schooner drifting down the Hudson with the tide near the ends of the piers and a ferryboat leaving her slip *held* due to faults of both vessels; the schooner which had lost steerageway because of the failure of the wind being in fault for not working further offshore while the wind held, and the ferryboat being in fault for starting from her slip at excessive speed, in view of the fact that her view was obstructed by the shed on an adjoining pier.

    In Admiralty. Suit for collision by the Erie Railroad Company against the schooner S. A. Carpenter, George A. Colgan, Jr., claimant, and cross-libel by George A. Colgan, Jr., against the ferryboat Tuxedo. Decree dividing damages.

    Park & Mattison, of New York City, for Erie R. Co.

    Macklin, Brown, Purdy & Van Wyck, of New York City, for George A. Colgan, Jr., and the S. A. Carpenter.

    CHATFIELD, District Judge. On the morning of April 14, 1917, the two-masted schooner S. A. Carpenter took a deckload of coal on board at the Delaware, Lackawanna & Western pier just south of the Hoboken ferry on the west side of the Hudson river. The Carpenter was intending to take this coal around the Battery and up the East River to one of the bays on the north side of Long Island. A strong ebb tide was running, and whatever wind was blowing came from the northwest. The Carpenter was under a reefed mainsail, foresail, and jib, and worked out into the river sufficiently to turn downstream, but as the wind failed and ultimately died out almost entirely under the lea of the shore, the tide carried the Carpenter downstream and in toward the pier heads. She thus could not maintain steerageway, even so as to work further out in the river.

    Her captain testifies that he was unable to do anything by which he could get away from the shore. He had an anchor in readiness to drop if danger arose, but, relying upon the right of way of a sailing vessel, he did not deem himself under any obligation to anchor in the stream. The weather was clear, and no rule or sense of duty suggested to him the blowing of a horn or other warning. Evidently, with the equanimity, patience, or indifference commonly shown by sailing craft, he made the best of a situation where he could proceed no faster than the tide, but where the tide was helping him in the direction in which he wished to go.

    Several hundred feet down the river the Carpenter passed the Wells Fargo covered pier immediately adjoining the Erie Ferry racks on the north side, at a distance of some 25 feet, when the Tuxedo, a double-decked ferryboat, blew her departure whistle and came out from the

⬅For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

third slip on a trip up and across the Hudson river to Twenty-Third street, New York.

The captain of the Tuxedo was in the pilot house and at the wheel. His mate or assistant pilot had come from the pilot house at the shore end as the ferryboat left the bridge, and the deckhand, having closed the gates, had also proceeded to the front, and reached a point in front of the gates at the forward end, as the bow of the ferryboat came to the point where the Carpenter became visible beyond the Wells Fargo shed. The sails of the Carpenter and her masts extended up to a height of some 50 or 60 feet, but were evidently invisible to any one upon the ferryboat until the lookout reported the Carpenter and warned the captain of the ferryboat to go back. The engines of the ferryboat had been started full speed ahead as the boat left the bridge, then slowed down to moderate speed until the boat was out of the slip, and the wheel of the ferryboat had been held neutral up to the point where the Carpenter was reported, as no tide had yet been met which required the use of the helm.

According to the testimony of the captain of the Tuxedo, he had not yet begun to shape his course for Twenty-Third street when the warning, followed by the reversal of his engines, came from the deckhand. Before stopping, the vessel covered a little more than the distance between herself and the Carpenter, which, coming down with the tide, poked her bowsprit through the guard rail of the ferryboat close to the bow, barely missing some of the passengers, who were warned or pushed back by the lookout.

The Carpenter suffered damage from the carrying away of her forward rigging and has brought action therefor. The Tuxedo suffered damage through the breaking of her rail and some of the forward superstructure, and has filed a cross-libel. The Carpenter alleges fault on the part of the ferryboat in leaving the slip at such speed and under such circumstances that she was unable to respect the rights of a sailing vessel, on a course across her path. The ferryboat alleges that the Carpenter was at fault in maintaining a course so close to the pier heads as to be dangerous to vessels coming out of the slips, and therefore to have been negligently navigated, and also that if the wind had died, so that the Carpenter was helpless and uncontrollable, she should have anchored at some time previous to the accident.

It is apparent that the Carpenter could not be at fault for having failed to drop her anchor after seeing the ferryboat, for sufficient time did not elapse, and the distance was not sufficient, to have stopped the Carpenter's headway, while, if the Carpenter had anchored directly in front of a ferryboat slip, she would have swung around to her anchor and been a more dangerous obstacle to the egress of the ferryboats than when floating.

The provisions of the New York Charter, to the effect that no boat shall navigate close to the pier heads in the North and East Rivers, is not specifically applicable to the present case, but it has been recognized as a rule of admiralty that vessels must not pursue a course close to the pier heads of ferry slips, so as to cause danger to vessels

coming out when observing reasonable caution and compliance with the general rules of navigation. The Breakwater, 155 U. S. 252, 15 Sup. Ct. 99, 39 L. Ed. 139.

It is obvious that a boat may become disabled, or through unavoidable circumstances may be forced into a situation where no warning is possible, and where a vessel navigating negligently may suddenly come upon it and cause injury or even death. The rule is mutual. A vessel with power, finding it necessary to proceed alongside or close to a pier end, must so keep herself under control as not to put into sudden danger an unexpected vessel coming out of the slip. A ferryboat leaving a slip may encounter a disabled gasoline craft or a rowboat. The ordinary rules of navigation control such a situation.

It has been recently held, in the case of The Bouker No. 2, 254 Fed. 579, 166 C. C. A. 137, and The M. Moran, 254 Fed. 766, 166 C. C. A. 212, that the starboard hand rule does not apply to vessels backing out of a slip to get on their course, but is applicable even to a ferryboat proceeding out of a slip and passing by a pier shed over which a lookout could see the flagpole of a boat at the end of the pier. The Columbia, 205 Fed. 898, 124 C. C. A. 230.

The Carpenter had the Tuxedo on her starboard hand, but was a sailing vessel, and the Tuxedo, therefore, could not rely upon the starboard hand rule. If the Wells Fargo shed had not intervened, the ferryboat could have easily seen the Carpenter while some distance inside the end of her slip. The express shed, therefore, forms an element of the situation which must be taken into account by ferryboats leaving this particular slip. If reasonable care interferes with the speed of the ferryboat, then the management and practice of the ferryboats must give way or be changed in some manner, so that the pilot may exercise that reasonable care which has always been in mind when ferry slips have been so constructed that the ferryboats can observe from their pilothouses passing traffic.

On the testimony of the case at bar, the court will find that the captain of the Carpenter was negligent in assuming a course downstream, too close to the pier heads, and in not working further offshore while he had sufficient wind so to do. On the other hand, the court will find that the ferryboat, owing to the presence of the express shed, left her pier at such a rate of speed, and allowed such time to elapse before the lookout reached the forward end of the ferryboat, as to be responsible in part for the collision.

Each libelant may recover one-half of the damage incurred, with costs.