## NEW ORLEANS COAL & BISSO TOWBOAT CO. et al. v. GASTON S. S. CO., Inc.

### No. 6693.

Circuit Court of Appeals, Fifth Circuit.

June 19, 1933.

Philip S. Gidiere and W. B. Spencer, Jr., both of New Orleans, La., for appellants.

Jas. Hy. Bruns, of New Orleans, La., for appellee.

Before BRYAN, FOSTER, and HUTCHESON, Circuit Judges.

HUTCHESON, Circuit Judge.

From an adverse decree in a suit for collision between the steamship Gaston and the steam tug Wilmot, the libelants, owners of the tug, appeal. The District Judge, finding the Wilmot solely at fault, exonerated the other vessel entirely. These facts are not in dispute. The collision occurred on September 21, 1928, at 11:30 in the morning in the harbor of New Orleans, at a point about 400 feet out from the New Orleans side of the river. The weather was ordinarily clear, visibility good, wind negligible, current, 2 to 2½ miles an hour. At the time and place of the collision, the river was clear of other vessels passing or maneuvering. For some little time before the collision occurred the tug had been lying bow up stream alongside of a ship docked on the New Orleans side. Before its occurrence, the tug let go to turn around in the river, and head down stream and across it to pick up an oil barge moored on the other side: The steamship Gaston, coming up about 300 or 400 feet out from the New Orleans docks, her engines full speed ahead, and making about 9 or 10 miles an hour, first observed the tug alongside the ship when down stream from it about 1,850 feet. The contentions as to what occurred shortly before the collision and what caused it make this lawsuit.

The Gaston's witnesses make it appear that, when she was about 300 feet from the tug, it cast off from the ship and headed up stream on a course substantially parallel to that the Gaston was on; that, believing she would overtake and pass it on its port side, she signalled to the tug for such a passing; that, without either answering the signal or attempting to conform to it, the tug suddenly changed its course, darting across the Gaston's bow; that, though following instantly upon the beginning of this extraordinary and dangerous maneuver the Gaston stopped her engines and put them in reverse, the damage had been done, the collision made inevitable. In addition to her crew, the Gaston offered the testimony of a shore witness that the captain of the tug, after the collision, had laughed and said, "Yes, I didn't see the damned ship."

The effect of the tug's testimony was that, shortly after the tug had let go and backed away to turn around and go across to Algiers, they saw the Gaston about 1,800 feet away, coming up the stream, and blew her one whistle to let her know the tug was coming down on her course; that, getting no reply, it stopped, and for a few minutes waited in that position to see what the Gaston was going to do. The Gaston blew no whistle and did not change her course, so, when she was 800 feet away, the tug blew four whistles, and came ahead with the engines full speed because the captain of the tug saw that, unless he did so, he would be struck amidship.

This picture of suspended animation, the tug standing motionless for some minutes in the harbor, like "a painted ship upon a painted ocean," until the Gaston had almost run it down, followed by the frantic attempt to extricate itself from the position of peril which this period of waiting had put it in, by darting across the Gaston's bow, so little comports with the general situation disclosed by the evidence, and with what would ordinarily be done under like circumstances, that little confidence is placed in this testimony by either side. Those for the Gaston declare it to be entirely unreasonable and absurd, an after explanation of a situation in which, through failure to observe and know what was going on in the river, the tug found itself, through no fault of the Gaston in a position to damage ship and tug.

Before us counsel for the tug, putting the testimony of these witnesses aside, pitch their case on the contention, based upon the testimony of her captain, that the Gaston was an overtaking vessel. They argue that, being such, it was in duty bound to avoid colliding with the overtaken tug. They urge, citing The Industry (C. C. A.) 29 F.(2d) 29, that, even if the overtaken tug did suddenly change its course and come across the Gaston's bow, this would not condemn it, for it was the Gaston's duty, as the following vessel, to watch out for the tug and not tread so closely on its heels as to trip it if it turned. Those for the Gaston repudiate the suggestion that this is the case of an overtaking and overtaken vessel. They say the case is one of special circumstances where the tug, darting out from her berth for the purpose of maneuvering to turn, was not on any

definite course, and was obliged to take all precautions to watch out for and avoid vessels coming up and down the river on their proper courses, Gaffner v. Pigott (C. C. A.) 116 F. 486; that the evidence taken as a whole and the very picture of the occurrence which it presents make it clear that what occurred was that the captain of the tug, without taking any precautions to observe, and without seeing or hearing the Gaston until she was right upon him, undertook to dart out into the river to make his turn; that, when he saw the Gaston, it was too late to do anything more than to try, by speeding up, to complete the maneuver he had so recklessly entered upon. They say that the Gaston was not at all at fault, because having given the passing signal, and having seen no evidence on the part of the tug of any purpose to cross her bow, she had a right to come on as she could safely have done if the tug had not tried to cut across her course.

The District Judge resolved the contentions in favor of the Gaston. He found that the tug, when the steamship Gaston was only some 200 or 300 feet below her, started out from the ship at a slight angle from the shore, headed up stream; that the steamship Gaston was then going full speed ahead, and about 400 feet away from the New Orleans shore. He took the Gaston's view of the matter that those on her saw the tug come out, and, supposing that the tug would keep to the Gaston's starboard side, signalled accordingly; that the tug gave no answer, but, continuing to angle out from the shore, suddenly and without warning, crossed the bow and path of the Gaston; that this course was so abruptly decided upon and so quickly executed that, though the Gaston stopped her engines and reversed, she could not avoid the collision. He found that those aboard the tug had not heard nor seen the steamship, and did not know of her presence until they started to turn and cross the river, and that this ignorance of the presence of the steamship was due to the failure of the tug to keep a proper lookout. He concluded, citing The M. Moran (C. C. A.) 254 F. 766, and The Edouard Alfred (D. C.) 261 F. 680, that the tug failed in its duty in endeavoring to turn around in the stream without first looking out astern, as well as ahead, for craft in the river.

We have given careful consideration to the evidence. We find the facts to be substantially as the District Judge found them. We reject as wholly without foundation the claim of the tug that, knowing that the ship was coming up, it put out into the stream 300 or 400 feet from the shore, and there stood calmly waiting for the Gaston to bear down upon and nearly cut it in two. Nothing in the facts, nothing in the inherent probabilities of the situation, makes such a statement reasonable. The fact of the matter is that, while the Gaston was proceeding on her course with a clear river ahead of her, observing all proper precautions, and having the right to believe that the tug which she saw lying moored would not suddenly dart across her course, she suddenly found herself placed in a position of imminent, unexpected, and unavoidable peril; that this was due to the action of the tug in either, with full knowledge that the Gaston was coming up, deliberately trying to cut across her bow, thinking she could make it, or to the tug's trying to make the turn, in ignorance, until too late, of the presence of the Gaston in the river. Upon either theory the tug was inexcusably at fault.

The decree was right. It is affirmed.