## THE FORT ST. GEORGE.

## THE OLYMPIC.

District Court, S. D. New York. July 29, 1927.

**1. Collision ⬤106—Maneuvering of vessel, in backing out of slip and straightening on course, presents case of "special circumstances."**

Maneuvering of vessel, in backing out of slip and preparing to straighten on her course, presents a case of "special circumstances."

[Ed. Note.—For other definitions, see Words and Phrases, Second Series, Special Circumstances.]

**2. Collision ⬤96—What is reasonable and prudent navigation in backing from slip depends on lawful customs of vessel and special conditions of wind and tide and passing traffic.**

What is to be regarded as reasonable and prudent navigation, in backing out of slip and straightening out on course, depends on the lawful customs of vessels, as well as on special conditions of wind and tide and passing traffic.

**3. Collision ⬤105(7)—Evidence held to show that vessel colliding with vessel backing out of slip was solely at fault in collision.**

Evidence *held* to show that ocean liner, in backing from slip and straightening on her course, did not back nearer to opposite side of river than was customary or necessary, nor negligently fail to check her sternway when she saw vessel coming down river, but showed negligence of such other vessel in traveling at excessive speed, in not navigating close enough to the opposite shore, and not porting soon enough when she decided to go to stern of backing vessel.

**4. Evidence ⬤586(3, 4)—Positive testimony as to blowing of whistles by colliding vessels must outweigh negative testimony of persons that they heard no whistles.**

Positive testimony that vessel backing from slip blew slip whistle, and a series of three backing whistles, and that vessel colliding therewith had blown a whistle, must outweigh negative testimony of persons who said they heard no whistles.

In Admiralty. Libel by the Oceanic Steam Navigation Company, Limited, against the steamship Fort St. George, the Bermuda & West Indies Steamship Company, Limited, claimant, and cross-libel by the Bermuda & West Indies Steamship Company, Limited, against the steamship Olympic, the Oceanic Steam Navigation Company, Limited, claim-

ant. Interlocutory decree for libelant, and cross-libel dismissed.

Burlingham, Veeder, Masten & Fearey, of New York City (Chauncey I. Clark and John K. Hartley, both of New York City, of counsel), for Oceanic Steam Nav. Co., Limited.

Kirlin, Woolsey, Campbell, Hickox & Keating, of New York City (W. H. McGrann and J. H. Turnure, both of New York City, of counsel), for Bermuda & West Indies S. S. Co., Limited.

AUGUSTUS N. HAND, Circuit Judge. The libel and cross-libel here were filed to recover damages arising out of a collision between the Olympic and the Fort St. George, off Pier 59, in the North River, on March 22, 1924. It was the last of the flood tide, the weather was clear, and all conditions most satisfactory for harbor navigation.

The Olympic, with one tug on her port bow, had just backed out into the stream, preparatory to entering upon her voyage, and the Fort St. George was coming down the river to go out to sea. Before the Olympic had got straightened around to go down the river, the Fort St. George found that she could not get past the stern of the Olympic, as she had proposed, without going hard aport. As a result of this, her bow cleared the Olympic, but her port quarter, about two-thirds of the way aft, brought up underneath the Olympic's port counter, her side scraped along the Olympic's rudder, and both vessels suffered damage.

The Olympic seeks to recover because the Fort St. George (1) proceeded at excessive speed and failed seasonably to slow, stop, or reverse her engines; (2) attempted to pass under the Olympic's stern without first obtaining a passing agreement; (3) failed to blow alarms. The Fort St. George, on her part, seeks to recover on the ground that the Olympic (1) performed an unusual maneuver in backing nearer to the New Jersey short than was her customary or necessary course; (2) moved astern and closed in on the Fort St. George, thereby frustrating the efforts of the latter to keep clear; (3) did not check her sternway when it was manifest that the Fort St. George was endeavoring to pass astern of her.

The Olympic is a triple screw steamer of about 46,000 tons gross, 882.6 feet long, and the Fort St. George is a steamer of about 7,800 gross tons, 411.3 feet long. The North River is about 2,700 feet wide off Pier 59, where the collision occurred.

Aside from various minor questions of

navigation there are the primary questions (a) whether the Olympic backed unnecessarily and uncustomarily far over to the New Jersey shore; (b) whether she negligently failed to check her sternway when she saw the Fort St. George coming dangerously near; and (c) whether the Fort St. George came down on her at an excessive rate of speed and in a negligent manner.

[1] Two preliminary observations may be made; the first that the contention that a perfectly equipped steamer like the Olympic, confessedly operating under the best conditions of wind and tide, should have departed greatly from her ordinary maneuvers in backing out of her slip and straightening on her course is inherently improbable. The second is that such a ship, when she is backed out to the end of her slip, extends nearly one-third of the way across the river, and would, if exactly in the middle of the stream, have a space of but little more than 900 feet of water, or just one ship's length, between her and each shore. Unless she was able to pivot on an unvarying axis, she could not straighten out to go down the river without departing from a position in the center of the stream and coming some distance nearer than 900 feet to one shore or the other. If she did not back to the center of the river before pivoting to straighten out, she would be nearer than 900 feet to the Manhattan piers. Such a case is always one of special circumstances, for the assumption is that the vessel had just left her slip and was preparing to straighten to get on her course. The Servia, 149 U. S. 144, 13 S. Ct. 817, 37 L. Ed. 681; The John Rugge (C. C. A.) 234 F. 861.

[2] What is to be regarded as reasonable and prudent navigation in each situation depends on the lawful customs of vessels, as well as upon special conditions of wind and tide and passing traffic. In the recent case of La Lorraine (C. C. A.) 12 F.(2d) 436, much relied on by the Fort St. George, the Prinz Friedrich Wilhelm, about 600 feet long, backed across the course of La Lorraine, about 300 feet to the Manhattan side of mid-river, so far that she had nearly 1,200 feet under her bow within which to make her turn downstream. In a per curiam opinion (bearing the unmistakable style of Judge Hough) the court said: "She had good right to back reasonably for the execution of this maneuver, but she had not the privilege of backing so far as to interfere with the navigation of vessels on their courses and not unreasonably near the pier head line. Just how far that backing privilege extends

* * * is no more possible to define, in yards than it is to extract a meaning from the word 'reasonable,' that will serve as a rule of conduct applicable to all cases irrespective of attending circumstances." It was held, not that La Lorraine, even under such circumstances, backed so far as to constitute negligent navigation, but that she did nothing to avoid collision when it seemed proximate until so near that to reverse was useless.

The Servia, 149 U. S. 144, 13 S. Ct. 817, 37 L. Ed. 681, lays down the general rule as to vessels backing from their slips and straightening to get on a course, which the court in La Lorraine doubtless was following. But the part of the North River where that collision occurred was 4,400 feet wide; the Noordland was only 480 feet long, and after backing from her New Jersey pier out to the center of the stream, stopping her engines, and signaling that she was to go ahead, waited two minutes before going ahead, and continued her sternway until she got between 800 and 1,000 feet from the New York piers. This was an unusual maneuver that brought her across the course of the Servia, who was navigating prudently. The court held the Noordland liable in these circumstances for not starting her engines ahead at once after stopping in mid-river and said: "There was no necessity for her to back further across the river" (page 156 [13 S. Ct. 821]), and that the court below had properly found her in fault for so backing "in view of the course and movements of the Servia" (page 155 [13 S. Ct. 821]), which had been heading down the river well under the Noordland's stern.

[3] I do not think that the Supreme Court would have expected the Olympic to pivot with as little extension in her movements in either direction from the center of the river as a vessel 450 feet long. She would seem to require more room at either end within which to move than a vessel like the Noordland, half her length and probably from only one-fifth to one-sixth of her gross tonnage. All but two of her witnesses as to her position testified that she was more than 1,000 feet from the New Jersey piers at the time of the collision; her chief officer and Straw, the master of her helping tug, said the distance was from 1,100 to 1,200 feet, and only 4 out of her 16 witnesses made it as little as 900. The Fort St. George witnesses varied the distance from 120 to 600 feet. As might be expected, the witnesses from the crew of the Olympic were much more numerous than those from the crew of the Fort St. George.

But the Fort St. George had some witnesses not connected with her, or any company allied to her, so far as the record shows. They were Le Brecht, the master of the Arcadian, a vessel which was passed by the Fort St. George in coming down the river, and then followed her and passed in front of the Olympic about the time of the collision, or shortly after; Keeler, the master of the Socony No. 22; William Johnson, master of the Timmins tug Mutual; Bade, master of the Delaware, Lackawanna & Western ferryboat Hoboken; and Allen Johnson, assistant inspector of Hull's United States Steamboat Inspection Service.

Le Brecht's deposition I thought that of an eager and partisan witness. He defended the navigation of the Fort St. George at every point, and described the Olympic as 1,000 feet from her pier, flying past the Jersey shore, just before the collision. That a responsible navigator could so describe the maneuver of a huge ship pivoting to straighten on her course deprives his testimony as to the important points of position in the river and sternway of much weight. Keeler said he was about ten piers below the place of collision on the New York side. That was too far away to make his judgment of distance of the Olympic's stern from the New Jersey shore at all accurate. He estimated that the stern of the Olympic was 500 or 600 feet from the New Jersey shore. Yet he said he was 1,000 feet off the New York shore, and had to go 200 feet toward New York to get under her bow. This made the Olympic nearer New York than New Jersey. He must have been more than half a mile below the Olympic and three-quarters of a mile from her stern at the time of the collision. I have much doubt whether he was in a position to make an estimate of great value, and his testimony as a whole is confused.

William Johnson, master of the Mutual, said he saw the collision from Pier 43, North River, where his tug was lying. His estimate was that the Olympic's stern was from 300 to 500 feet from the New Jersey piers. He must have been a mile away, and yet he attempts to judge the distance of the stern of a huge ship angling down across the stream at such a great distance. Bade, master of the ferryboat Hoboken, was at her slip at West Twenty-Third street, Manhattan. He was at least half a mile from the New Jersey shore. He says the collision was "well over on the Jersey side." Of course, it would be if the Olympic was in the center of the river, for her stern would even then be two-thirds across.

Allen Johnson was the only one of the four outside witnesses specially relied on by the Fort St. George, who was near to the collision. He was on a pier at Ninth street, Hoboken, probably 1,000 feet from where he claimed the stern of the Olympic was when the collision took place. He did not estimate the distance of her stern from the New Jersey piers, but said he figured it out immediately after on a chart by taking a range from some point in Manhattan, near Twelfth street. He gave no reason for such a proceeding, other than a sort of chronic range habit. This witness I regard as of little weight, but he puts the distance as within 600 feet from the shore. These outside witnesses may be regarded as conceding that the distance was 500 or 600 feet. But I think their testimony, as well as Le Brecht's and that of the witnesses from the Fort St. George crew, insufficient to indicate that the center of the Olympic was 300 feet beyond midstream. She may have been somewhat beyond it, but I am not persuaded by the Fort St. George witnesses that her position was unusual or unreasonable. Nor do I believe, if her position be taken to have been 600 feet from the New Jersey shore, that a vessel of her length, with a momentum so great that she cannot be stopped as quickly as a smaller vessel, should be held in fault for that alone. A ship so huge should be allowed greater leeway in her movements. In view of everything, I think the inherent probability that the Olympic backed out in her customary way is stronger than the testimony of interested witnesses from the crew of the Fort St. George and the unconvincing evidence from the outside witnesses which that vessel has produced.

[4] Having thus disposed of the distance to which the Olympic backed, I find her engine movements thoroughly justifiable, both by the entries in the deck log and the engine bell book, which will be later referred to on another point. Both are typical records of a steamer backing from her pier and beginning to pivot around to straighten out on her course. There is abundant and convincing testimony that she blew her slip whistle and a series of three backing whistles. It is incredible that she should not have done this, and by settled rules her witnesses, who testified that such whistles were sounded, must outweigh negative testimony of persons who said they heard no backing whistles.

The Fort St. George was at fault for proceeding down the river at excessive speed. The huge Olympic was inevitably occupying one-third of the river in carrying out any backing maneuver. The speed of the Fort

St. George is shown by her own records to have been extremely high. It would seem that she straightened out at 11:02 o'clock, and that she had as much as 1½ miles to traverse before the collision which occurred, by her time, at the latest at 11:08. Deposition of Gillies, p. 195, and of Davies, p. 73, Exhibit 8. Thus in six minutes she covered the distance and had an average rate of speed of 15 miles an hour. This was nearly her highest possible speed. Miller, her chief engineer, said she would do 15½ knots at sea. The entries in the engine log represent her as running at half speed about two-thirds of the time. If these entries were correct, they would raise her average speed during the distance to a rate which she could not possibly have maintained. In other words, the log seems to be palpably incorrect in respect to the periods during which the Fort St. George claims to have run at half speed. But one would seem to be justified in taking the entries as to when the various engine movements were initiated. To cover such a distance in the time available indicates, as a matter of mere mathematics, that the Fort St. George was running at a reckless rate of speed. Even her witness Le Brecht said: "You have to take all the precautions imaginable" (page 278) where a vessel is approaching the Olympic under such circumstances.

Certainly, when the Fort St. George saw a huge vessel backing out in the river, she should have stopped or reversed her engines seasonably. The New York, 175 U. S. 187, 20 S. Ct. 67, 44 L. Ed. 126; The Lexington (C. C. A.) 275 F. 279; The Buenos Aires (C. C. A.) 5 F.(2d) 425; La Lorraine (C. C. A.) 12 F.(2d) 436. Instead of that, she got so near the Olympic before taking any steps that she was obliged to go hard aport at full speed to save complete disaster. Even if the Fort St. George was running at only half speed, or 10 miles an hour, until just as she went hard aport, she would, at half speed, cover one knot in six minutes, or about 1,000 feet in one minute. Her pilot said there was no cause to slow, stop, or stop and reverse, even at 1,500 feet away from the Olympic, "because she was laying still," and only apparently when he got down to 800 or 1,200 feet away did her movement convince him that it was necessary to take some prudential measure, and then it was too late. Only when she was not over 700 feet away did the Fort St. George hard aport. Banyard, Minutes, p. 32; Davies, pp. 82, 83.

Capt. Francis, of the Fort St. George, testified:

"Q. When you took charge of the ship, and started giving orders, and you gave this order to port and decided to go under her stern, you calculated that she would not go any further over than she was at that time? A. I took it that she might come a little further; but not as far as she did.

"Q. But you didn't wait to see just what she was going to do? A. Evidently, I didn't; of course I didn't."

Francis, p. 61.

Banyard, the chief officer of the Fort St. George, testified:

"Q. How far off was the Olympic at the time you thought there was going to be a collision? A. Oh, quite a short distance; I don't know whether a ship's length, or a ship's length and a half.

"Q. That would be, then, from 400 to 600 feet away, when you thought there was going to be a collision? A. Yes, sir.

"Q. Hadn't you thought before that there was going to be? A. No; I thought we were clear; I thought the Olympic would gain headway before that, and we would get by on the Jersey shore.

"Q. And yet she appeared all the time to be going astern? A. Yes; she appeared to be going astern from where I stood.

"Q. In other words, the reason you thought there wasn't going to be a collision, you thought, before you got there, the time would come when the Olympic would stop and start ahead and make more room? A. Yes, sir; if she had only stopped, we would have gotten by; but she came astern."

Banyard, pp. 31, 32.

I do not think there is a reasonable doubt that the Fort St. George was in fault for proceeding at a high speed and for not taking the least precaution in a situation where great care was necessary.

The last question really is whether the Olympic was in fault for not going ahead sooner, when she saw the course of the Fort St. George. It is to be remembered that Banyard, the chief officer of the Fort St. George, thought she could pass safely, and not until she was from 400 to 600 feet away did her officers think it necessary to hard aport her helm. As it was, she almost got by, and several witnesses said her stern cleared the Olympic by 100 feet. Freeman, the assistant commander of the Olympic, said he saw danger when the Fort St. George was 1,000 feet away and notified the bridge. The danger seemed to be that the Fort St. George was not porting sufficiently and was coming at too high a speed. Freeman, 11, 12. As soon as this was apparent, the order

was given to port the starboard engine full speed ahead; the port engine having already gone ahead for some time. From the time of starting the engines of the Olympic astern, at 11:05, to the moment of the collision, 7½ minutes elapsed according to the deck log. During this period her port engine was stopped for one minute and was full speed ahead for 2½ minutes; her starboard engine was slow astern for 3 minutes and full ahead for one-half a minute. This, of course, shows a pivoting movement, and in view of the fact that some time was required to notify the engine room one-half minute of full ahead engine movement was as prompt action as could be expected. The engine bell book (Exhibit 9) may indicate full speed ahead for one minute, but I take the log (Exhibit 8) as the final record.

Both sides seem to have thought the likelihood of collision existed during a very short time, and that within only a distance of 600 feet which was traversed by the Fort St. George at high speed was there danger. In these circumstances, whether or not the engineer of the vessel got her under any forward motion before the collision, as all her witnesses, except Ismay, testified, the order seems to have been given promptly, as soon as danger was thought to be imminent. This was all that could be asked of the Olympic, when engaged in a proper movement to straighten on her course. The claim of the Fort St. George that the Olympic suddenly backed shortly before the collision, after once getting still in the water, is contradicted by her log and the engine bell book, as well as by all the probabilities. I find, in view of her testimony, that the Fort St. George blew a whistle before attempting to pass to the stern of the Olympic. Her positive testimony to this effect should outweigh the negative testimony for the Olympic.

I find the Fort St. George in fault for coming down at too high speed, and not navigating far enough toward the New Jersey shore, and not porting soon enough when she decided to go to the Olympic's stern. She should not have assumed that the latter would go forward to get out of her way, but should have acted prudently in laying her course, and in sooner porting her wheel. The Olympic had the Arcadian coming down between her and the New York pier, which somewhat added to the problems with which she had to deal. The fact that the Fort St. George, even on the testimony of some of her own witnesses outside of her crew, had at the last 600 feet of water within which to clear

the Olympic's stern indicates an inexcusable neglect.

The libelant is entitled to an interlocutory decree, providing for the usual reference to report as to damages, and the cross-libel is dismissed.

Settle decree on notice.