## UNITED STATES LINES CO. v. THE OCEAN VAGRANT et al.

## BRITISH MINISTRY OF WAR TRANSPORT v. THE CHAGRES et al.

## THE MADELINE MESECK.

## THE EUGENE MESECK.

## THE EDWARD MESECK.

United States District Court
S. D. New York.
March 3, 1949.

Kirlin, Campbell, Hickox & Keating, New York City, for United States Lines Co. John F. Gerity, New York City, of Counsel.

John F. X. McGohey,* United States Attorney, New York City, for British Ministry of War Transport. Alfred T. Cluff, Special Assistant to The Attorney General, of counsel.

Purdy & Lamb, New York City, for Tugs Madeline Meseck, Eugene Meseck and Edward Meseck and Meseck Towing Lines, Inc. Edmund F. Lamb, New York City, of counsel.

HULBERT District Judge.

### Statement

These suits in admiralty arose out of a collision which occurred in the Hudson or North River, as it is locally designated, at about 7:15 A.M. on May 7, 1943. The S. S. Chagres, owned by the United States Lines, and the S. S. Ocean Vagrant, owned by the British Ministry of War Transport, were two of the vessels involved.

The libel of the United States Lines against the S. S. Ocean Vagrant was filed on May 13, 1943, and the tugs Madeline Meseck, Eugene Meseck and Edward Meseck, and Meseck Towing Lines, Inc., were impleaded by The Ocean Vagrant only on October 19, 1945.

The cross-libel of the British Ministry of War Transport against The Chagres was also filed on October 19, 1945. Although the suits have not been consolidated, they were tried together and will be disposed of in one opinion.

### Preliminary Motion.

At the outset, the impleaded tugs and towing company moved to dismiss the libel as to them on the ground of laches. It was contended that the position of the impleaded respondents was prejudiced in that during the period this case was pending before the tugs and towing company were impleaded, seven depositions were taken at which the impleaded respondents, of course, were not represented. However, after they were impleaded, the tugs and towing company participated in the taking of additional depositions, and the Court denied that motion.

### Analysis of the Facts.

The North River is approximately 2800 feet wide between the pierhead lines on the New York and New Jersey shores respectively at the point of collision. Both vessels were approximately the same length, The Chagres being 427 feet long and The Ocean Vagrant 425 feet in length.

On the morning of the collision, The Chagres had no cargo aboard, and was moored at the south side of Pier 62, N. R., bow in, close to the bulkhead. There was another ship, the S. S. Calobre, moored astern of The Chagres in the outer berth on the south side of Pier 62, her stern extending about 50 feet beyond the end of said pier. There were two ships moored on the north side of Pier 61 occupying the length of that pier. On the river of that pier there were moored, each abreast of the other, some eight to ten barges, occupying about 300 feet of the river beyond the end of said pier. At the time of the colli-

---

* By the terms of the United States-British Reciprocal Aid Agreement of 1942, the United States Government was called upon to act in the interests of Ocean Vagrant.

sion, a tug, The Mary Meseck (not here involved) was moored to the outermost of said barges. The clear space in the slip between the two vessels moored on the south side of Pier 62 and the north side of Pier 61 was about 150 feet.

. The weather conditions prevailing at the time of the collision were as follows: broad daylight; clear, although somewhat hazy over the land; visibility was such that objects could be distinguished at least one-half mile away; the tide was ebb with no significant wind.

· During the undocking maneuver of The Chagres, the tug Madeline Meseck was on a hawser aft, The Eugene Meseck was head on the starboard quarter, and The Edward Meseck head on the starboard bow of The Chagres. · When the lines to the dock were let go, The Chagres, with the aid of the tugs, was breasted out into the center of the slip and straightened up. Paulson, the shore boatswain of the United States Lines, proceeded to the stern of The Calobre, looked up and down river, and signalled to Captain Ball, the harbor pilot of Meseck Lines on The Chagres, that all was clear. This signal was acknowledged by Captain Ball. Thereupon, The Chagres blew a prolonged slip whistle, and The Madeline Meseck did likewise. During this time, The Chagres was being slowly towed out into the river by The Madeline Meseck, the other two tugs being employed to keep The Chagres straight in between the vessels moored at Piers 61 and 62.

. When The Chagres was approximately abreast of The Calobre, she commenced to back under her own power. Her engines were put full astern, and she sounded a three blast backing signal. The deck log of The Chagres puts the time of this full astern movement at 7:10, and the engine bell book indicates 7:11 A.M. The testimony is that it took approximately one minute for The Chagres' screw to build up to its full revolutions astern, and since part of the screw was out of the water, it did not have its full thrust therein. Both the deck log and the engine bell book put the time of stopping the engines at 7:13, full ahead at 7:14, and collision at 7:14½ (deck log) and 7:15 (bell book).

While The Chagres was backing under her own power, no one of the tugs aided her in such movement but, under orders from Pilot Ball, they were engaged in holding the ship against the ebb tide, which was running at about two knots. The Madeline Meseck on the hawser aft had then swung around the stern of The Chagres and headed up river; The Edward and Eugene Meseck were still on the starboard bow and quarter, all tugs approximately at a right angle with The Chagres.

The Ocean Vagrant left her berth at Pier 88 (West 48th Street, Manhattan) at about 6:59 A.M. She had a full cargo and was destined for an ocean crossing to Europe. The ship was undocked by a tug pilot and was turned over to Captain Warner, a Hudson River pilot serving as an auxiliary to the Sandy Hook Pilots Association because of the great need at that period for pilot service. After The Ocean Vagrant was well clear of the pier at which she had been berthed, her bow was swung around to starboard and she headed down stream. The tugs which had assisted her in her undocking maneuver had been released before the pilot took over. Captain Warner and Captain Wilson, The Vagrant's master, were on the flying bridge. The third officer and helmsman were in the pilot house, below the flyng bridge, the chief officer was on the forecastle as a lookout, and the carpenter was also forward standing by the anchors. Orders from the pilot were given to the third officer and helmsman through a voice tube.

The pilot of The Ocean Vagrant testified that when he first saw The Chagres she was fully out of her slip—he could see both the bow and the stern—and The Ocean Vagrant was at that time from ½ to ¾ of a mile above her up river.

Captain Wilson testified that when he first saw The Chagres her stern was coming clear of the piers, and The Ocean Vagrant at that time was ½ mile distant and from 300 to 400 yards from the Manhattan pier ends. According to the proof offered on behalf of The Ocean Vagrant, no whistle signals were heard from The Chagres but that, after sighting The Chagres The Ocean Vagrant blew a one

blast whistle signal. At that point, however, the pilot did not order any movement of the helm to starboard, but when he received no answering signal from The Chagres, another one blast was given by The Ocean Vagrant and a starboard wheel was ordered.

The engine movements of The Ocean Vagrant, after she was out in the stream, were as follows: 7:03 stop and slow ahead; 7:04 half ahead; 7:09 slow ahead; 7:15 half ahead; 7:15½ stop; 7:16 full astern; 7:17 double full astern and collision. There are material differences between these times as recorded in the engine movement book and those in the deck scrap log of The Ocean Vagrant. The Court accepts the times as indicated in the engine movement book as more accurately determining the intervals between the various movements. Some of the discrepancies may be accounted for by the interval between an order and its execution. The actual speed of The Ocean Vagrant is in dispute. The shore boatswain of the United States Lines estimated it at 8 or 9 knots; Captain Ball put it at 7—8 knots; Pendulic, on The Mary Meseck (at Pier 61) testified The Ocean Vagrant was coming fast with a "bone in her mouth". Warner, the pilot on The Ocean Vagrant, put her speed at 5 to 6 knots. The Ocean Vagrant's master estimated his ship's speed at 5 knots. From all of the evidence, and considering the ebb tide and the distance The Ocean Vagrant covered from the time she started down river until the collision, she must have been making at least 6 or 7 knots on the average.

Captain Warner further testified that when a ½ ship length from The Chagres, the starboard anchor was dropped by The Vagrant in whose behalf it is contended that between the astern engine movements and the dropping of the anchor The Ocean Vagrant pulled up and became stationary in the water at the time that The Chagres either backed or swung into her.

The locus of the collision was a difficult factor for the Court to determine. The master of The Ocean Vagrant testified that his ship was in mid-river at the point of the collision. The pilot of The Ocean Vagrant testified that the collision occurred about a ship length off Pier 9, Hoboken, New Jersey. This testimony of Captain Warner discounts itself. In order that The Chagres could have reached a point of collision off Pier 9 Hoboken, it would have been necessary for her to have covered the distance from Pier 62 at an average speed of over 15 knots.

All The Chagres witnesses placed the point of collision at 900—1000 feet from the river end of Pier 61, which is about 2500 feet from that fixed by Captain Warner. This estimate is most plausible from an analysis of all of the evidence, and is accepted by the Court. The proof is that The Chagres was backing under power for three minutes at the most (according to her deck log). Of this period, it took about one minute for the propeller to build up its full revolutions astern, so that the backing interval under power was only about two minutes. Then the ship stopped its engines, and drifted back for one minute. The estimated speed at which The Chagres backed was 1 to 3 knots. Taking the 3 knot estimate, The Chagres backed 600 feet in the two minutes that she was under full power. Considering the first minute when she was building up full power, and the minute she drifted astern with engines stopped, and the minute with engines full ahead before the collision, it appears to the Court that the most that The Chagres' stern was extended into the river at the time of the collision would not exceed 1,000 to 1200 feet. Therefore, the Court determines that the collision took place at a point between mid-river and the end of Pier 61.

This case is one of special circumstances. The Servia, 149 U.S. 144, 13 S.Ct. 817, 37 L.Ed. 681; La Lorraine, 2 Cir., 12 F.2d 436; The Fort St. George, D.C. S.D.N.Y., 22 F.2d 195 affirmed 2 Cir., 27 F.2d 788.

The Court will now consider the conduct of The Ocean Vagrant.

The Ocean Vagrant is found at fault in her navigation under the circumstances. The testimony on both sides establishes conclusively that there was no

traffic on the New Jersey side of the river, and there was no excuse for The Ocean Vagrant to continue to navigate on the Manhattan side of the river when she sighted The Chagres backing into the river from ½ to ¾ of a mile away. The master of The Ocean Vagrant admitted that if his ship had taken any action when the vessels were a half mile apart, no collision would have resulted.

One of the prime causes of the collision was the assumption on the part of the pilot on The Ocean Vagrant that The Chagres would not back to mid-river before starting her turn to head down river. The Court does not find that backing to mid-river would have been an unreasonable maneuver in view of the fact that the barges were moored to the end of Pier 61. The Chagres had to back sufficiently far out to avoid them when she came forward in her turn down river. The Ocean Vagrant should not have made that assumption, but should have acted sooner in starboarding her helm to pass clear of The Chagres.

The Court does not believe that The Ocean Vagrant was stationary in the water at the time of the collision. The engine movement book indicates that The Ocean Vagrant's engines were going full astern for only one minute before the collision. Captain Wilson admitted on cross examination that if his vessel was doing something more than 5 knots it would take two to three minutes to stop his ship in the water.

Another indication that The Ocean Vagrant did not take any avoiding action until she was in the very jaws of collision is the fact that the angle of collision was almost a right angle. The evidence establishes that The Chagres was athwart the river at the time of the collision, and Captain Wilson said that the angle of collision was about 15 degrees less than a right angle. So that, with The Ocean Vagrant's rudder movements, with the dropping of her starboard anchor, and with the engines going full astern for one minute, all the change that was accomplished in her heading was about 15 degrees.

The only conclusion that the Court can draw from these facts is that The Ocean Vagrant was glaringly negligent and at fault in causing the collision.

The Court will now consider the conduct of The Chagres. The acts of negligence asserted against her may be stated as follows: (1) Failure to continue sounding her slip whistle until she had emerged from behind her pier; (2) failure of lookout; (3) failure to answer The Ocean Vagrant's one whistle signals.

With regard to the slip whistle, it is true that in many cases a vessel had been found negligent for her failure to sound a slip whistle until she cleared an obstructing slip. The Supply No. 4, 2 Cir., 109 F.2d 101; The Samson, 2 Cir., 93 F.2d 497. But in the case at bar, the failure to sound a slip whistle until the vessel cleared the slip did not have any causal connection with the subsequent collision. As previously mentioned, Captain Wilson testified that he saw The Chagres as her stern was emerging from the slip. Captain Warner said he first saw The Chagres when she was clear of the slip. The testimony of these two officers clearly indicates that when they first saw The Chagres there was ample room for The Ocean Vagrant to maneuver to avoid any collision if she had thought it necessary to do so.

Concerning the lookout on The Chagres, it is again repeated that the shore bos'n said he looked up and down the river before The Charges started backing out and gave the all clear signal. An officer and several of the crew were all on The Chagres' stern but it does not appear that any one of them was designated as a lookout. The captain of The Chagres saw The Ocean Vagrant and notified the pilot who then went to the port side of his bridge and saw The Ocean Vagrant himself. The captain was admittedly occupied recording engine movements and other data while the pilot was busy directing the tugs in the undocking maneuver. Had there been an adequate lookout on The Chagres he could have kept the pilot informed of the movement of The Ocean Vagrant, and this would have enabled the

pilot of The Chagres to take more seasonable action, but because of the lack of the lookout's observations and reports the pilot continued to back The Chagres into the path of The Ocean Vagrant and into an impending collision.

 The Court also considers that The Chagres was negligent in not acknowledging The Ocean Vagrant's whistle signals, or at least sounding a danger signal while still continuing to back out into the path of The Ocean Vagrant without waiting to see whether her announced maneuver would be carried out. As pointed out previously, this is a case of special circumstances, and ordinary steering rules do not apply, but the special rule does require prudent seamanship and due regard for the dangers of navigation and collision. Although the ordinary rules did not apply, "this does not mean that all signals that will promote safe navigation are to be dispensed with." The Transfer No. 18, 2 Cir., 74 F.2d 256, 258. Had The Chagres answered the first whistle signal of The Ocean Vagrant, the latter could and undoubtedly would have starboarded her helm sooner and thus the collision might have been averted. Had The Chagres exercised more prudent seamanship and slowed down immediately upon sighting The Ocean Vagrant, which was seen to be proceeding on the Manhattan side of the channel, the collision might likewise have been prevented.

Therefore, the Court finds The Chagres also at fault.

 Finally, the Court determines that the libel as to the impleaded tugs and towing company must be dismissed. There is no fault made out against them. No evidence of any negligence was submitted as to The Eugene or Edward Meseck. The only possible evidence against The Madeline Meseck was that two witnesses on The Ocean Vagrant, the master, and carpenter who was on the forecastle, said they saw the line which the tug had out from The Chagres fouled in the screw of The Chagres before the collision. However, the Court does not believe that either of these two witnesses was in any position to make this observation before the collision. The carpenter was on the starboard side to let go and attend the starboard anchor. He could scarcely have seen the hawser. The same is true of the master, busy as he was with the maneuvering of his ship to avoid the collision when The Madeline Meseck cast off her line to save herself. If it fouled The Chagres' screw, as it probably did, it was aided by the tide, but the Court cannot credit the assertion that it could be seen when The Chagres' screw was only a foot out of the water.

Furthermore, the witnesses from The Chagres testified positively that the line was not fouled in the screw until after the collision. The act of The Madeline Meseck in letting go of the line was an act in extremis in a situation not caused by any of her own wrongdoing.

## Judgment

A decree may be entered providing that each ship recover one-half its damages from the other. If the parties cannot agree on the damages, provision may be made for the appointment of a Commissioner to hear and determine.