## THE SAMSON.

### THE SOCONY 9.

#### No. 86.

Circuit Court of Appeals, Second Circuit.
Dec. 6, 1937.

Burlingham, Veeder, Clark & Hupper, of New York City (Chauncey I. Clark and Adrian J. O'Kane, both of New York City, of counsel), for appellant and steam-tug Samson.

Macklin, Brown, Lenahan & Speer, of New York City (Paul Speer, of New York City, of counsel), for claimant-appellee.

Before MANTON, L. HAND, and SWAN, Circuit Judges.

MANTON, Circuit Judge.

The tug Samson left Rockaway bound for Tremley Point, N. J. intending to stop at pier 5, Staten Island, to pick up a member of its crew. She approached Tompkinsville, S. I., with the weather clear, tide about low water slack, with the master and a deckhand, a licensed pilot, in the pilot house. Another deckhand was on

the deck; the mate was on the bow. She intended to land inside the end of Pier 5 in the slip formed between that pier and pier 6. This slip was about 300 feet wide and 1,124 feet long from bulkhead to pier end. Both piers, 5 and 6, are covered with sheds extending substantially to the pier head line and the shed on pier 6 was 37'4" high obstructing the view into the slip from the south, making it impossible for the Samson, navigating to the slip, to observe other craft approaching from that direction.

As the Samson came in toward the Staten Island piers, her engines were reduced to slow speed off pier 7 and stopped at pier 6 to allow the running off of her remaining headway as she drifted toward her landing inside the corner of pier 5. However, she came in close to the end of pier 6, so that the view into the slip was obscured. When about 50 to 100 feet off the northerly corner of the pier, the lookout observed the tug Socony 9 about 150 to 200 feet inside the pier end, backing out of the slip. The Samson sounded a one-whistle signal followed by a three-blast signal and an alarm, and she thereupon put her engines full speed astern.

The Socony 9 was backing out at about half speed—3½ to 4 knots. The Socony 9's witness testified that a long blast was given when she was about 200 feet from the end of the slip. The witnesses for the Samson testified they heard no whistle, although they saw the tug backing out when it was 150 feet from the end of the pier. Witnesses for the Socony 9 saw the Samson shortly after blowing their slip whistle.

Steam vessels moving from docks or berths, where other boats are liable to pass from any direction toward them, should give the same signal as in the case of vessels meeting at a bend, but immediately after clearing their berths they are to be governed by the steering and sailing rules. Inland Rules of Navigation, art. 18, rule 5 (33 U.S.C.A. § 203). Steaming out of this slip, the Socony 9 was not only required under the rule to give a proper slip whistle, but this was imperative. The blast of the steam whistle, said to have been given, was insufficient. If intended as a slip whistle, its purpose was not accomplished since it did not give notice to the Samson while the Socony 9 was emerging from the slip obscured from the view of vessels passing up and down

the channel. The slip whistle should have been started earlier and continued longer. It was the navigator's duty to be positive and give adequate warning to boats approaching the slip or passing in the channel outside. Barton Lighterage Co. v. Davis (C.C.A.) 4 F.2d 999; The Edouard Alfred (D.C.) 261 F. 680; The Transfer No. 18, 188 F. 210 (C.C.A. 2).

The Socony 9 also admitted hearing the Samson's one-blast signal immediately after she came in sight, but her engines continued in astern motion and were not put forward until the vessels were only about 50 feet apart. The mate gave as his reason for not reversing sooner that he "thought" the Samson would alter her course and let the Socony 9 continue backing out, and therefore he did nothing until it was determined that the Samson was not altering her course.

Under these circumstances, we think the Socony 9 failed to reverse and reduce her speed in time, and did not blow her whistle long enough to make known her presence, backing out of the slip.

Moreover, the Socony 9 was at fault in backing out of this obscured slip without being under such control as to have avoided this collision. The vessel is a powerful steamtug with a speed of 8 knots astern, and half speed astern would be at least 50 per cent of this. She was at half speed and continued so until just before the collision, depending on the Samson to alter her course. Continuing her speed as she did until approximately out near the end of the slip was not sufficiently slow to enable her to avoid collision with a craft entering it. It was her duty, when that close to the end of a blind slip, to keep under control and anticipate the presence of other vessels. The Poling Bros. No. 2, 62 F.2d 357 (C.C.A. 2). In The Poling Bros. No. 2, supra, in a somewhat similar situation, we said it was a case of special circumstances, and each vessel was bound to anticipate the possibility of the other's presence. See The Daniel Willard (C.C.A.) 235 F. 112. The Socony 9 should be held at fault.

The Samson also was negligent in its navigation. She was navigating close to the pier ends and coming in at such an angle that the shed on pier 6 obscured the view into the slip. Her master testified that he was within 150 feet of pier 6, but before the local inspectors he gave the

distance as 50 to 100 feet. In either case, he was too close. The Poling Bros. No. 2 (C.C.A.) 62 F.2d 357. This was a departure from a safe course and the Samson was properly held to be at fault.

A decree will be entered against both claimants.

Decree modified.