## THE SUPPLY NO. 4.
## THE DALZELLEA.
### No. 106.

Circuit Court of Appeals, Second Circuit.
Jan. 22, 1940.

Crowell & Rouse, of New York City (E. Curtis Rouse and George L. Varian, both of New York City, of counsel), for appellant.

Burlingham, Veeder, Clark & Hupper, of New York City (Chauncey I. Clark and Edward L. Smith, both of New York City, of counsel), for appellee.

Before SWAN, CHASE, and CLARK, Circuit Judges.

SWAN, Circuit Judge.

This appeal involves a collision in the East River between the libellant's motor tanker Supply No. 4 and the claimant's tug Dalzellea. It occurred about 7 o'clock in the morning on March 12, 1938, as the tug was emerging from a slip on the Brooklyn side and the tanker was proceeding up the East River close to the pier ends. The day was clear, with only a light breeze; the tide had run ebb for about an hour. As the district judge stated in his opinion (unreported), there was no reason for the collision except carelessness, and the question was whether both vessels were at fault or only one. They came together at a point about 75 feet from the end of pier 27 and before the tug, 94.3 feet in length, had fully emerged from the slip, the bow fender of the tug coming into contact with the bluff of the tanker's starboard bow a few feet from her stem. The district court exonerated the tug and held the Supply No. 4 solely responsible. Accordingly the libel was dismissed.

The slip from which the tug was emerging is about 700 feet long and 180 feet wide; it lies between piers 26 and 27. Barges tied up to the piers reduced the navigable water between them to about 90 feet. Pier 27 is on the southerly side of the slip. It has a covered shed about 30 feet high extending to within 15 feet of the river end of the pier. The Supply No. 4 was approaching pier 27 from the south. Her master was at the wheel and a deck hand was with him in the pilot house acting as lookout. She is a small wooden vessel, 85 feet in length and of 122 registered gross tons. On account of the height of the pier shed the tug was not visible to those in charge of the tanker until the tug's bow passed the pier end, and the tug's master could not see the approaching tanker until the pilot house of the tug, 19½ feet back from its bow, was almost up to the end of the shed.

The first tug to leave the slip was the Fred B. Dalzell. She sounded the usual slip whistle and when a short distance beyond the pier end (60 or 70 feet her master says) blew a one blast navigating signal to the Supply No. 4 which the latter answered with one. They passed port to port a few hundred feet south of pier 27. The Supply No. 4 claims that it was the execution of this maneuver that brought her in close to the pier ends and that as soon as she had passed the Dalzell she changed her course to port to angle out toward the center of the stream. When her master saw the stem of the tug Dalzellea emerging from the slip, he blew a two blast signal and continued on at full speed until just prior to the collision, when he reversed. No slip whistle was heard by the navigators of the tanker, but the district judge found that one was sounded. The Dalzellea was following the Fred B. Dalzell out of the slip, about 200 feet behind. She started from the bulkhead and when about half way up the slip stopped her way to allow the Dalzell to get ahead, and then started up again under one bell. She started blowing a slip whistle when about half way up the slip and ceased blowing it when her pilot house was about 50 feet from the pier end. About the same time she stopped her engines. Very soon thereafter her master saw the Supply No. 4 a short distance below pier 27. He sounded an alarm and put his engines in reverse. According to the testimony of the master and the lookout of the tug her headway was entirely stopped at the time of collision, and from the finding that the tanker "ran into" the tug, we infer that the district judge accepted this testimony.

■ The faults of the Supply No. 4 are so clear as to require little discussion. She was shaving the pier ends at undiminished speed. This is enough to condemn her without considering other charges of fault found against her. The Newark, 2 Cir., 289 F. 801; The Kookaburra-Jamestown,[1] affirmed, 2 Cir., 71 F.2d 998; The Samson, 2 Cir., 93 F.2d 497.

■ The appellant contends that the Dalzellea was at fault in failing to keep a proper lookout, sounding an inadequate slip whistle, and coming out into a blind fairway too fast. As the tug came up the slip the deckhand who was to act as bow lookout was picking up fenders along the side; he was at the bow when the tug emerged from the slip. While it is true that he could not have seen the Supply No. 4 until the tug's bow passed the pier end, it is urged that he might have become aware of her nearby presence from her answering whistle to the tug Dalzell, had he been devoting his undivided attention

[1] No opinion for publication.

to the duties of a lookout. He testified that he heard the Dalzell's one blast signal, but "wasn't paying any attention at the time" and didn't hear any answering whistle; that had he heard one he would have known that another boat was coming up along the piers to go under the Dalzell's stern, and would have signalled the captain. The district judge made no finding with respect to the tug's lookout except to remark that the lookout, "however efficient, could not have seen any vessel coming toward the entrance of the slip until the bow of the Dalzellea had passed the pier shed at the extreme end of the pier." This fact, however, does not absolve the lookout from the duty to listen, nor justify the diverting of his attention to the performance of other duties, such as gathering up fenders. We are disposed to think that the tug did not have a sufficiently attentive lookout. See Edward J. Barton Lighterage Co. v. Davis, 2 Cir., 4 F.2d 999, 1000; The William A. Jamison, 2 Cir., 241 F. 950, 952.

 If this were her only fault we might be unwilling to condemn the tug in view of the glaring faults of the tanker. But the tug was also at fault in respect to her slip whistle. Admittedly she ceased to sound it when the pilot house was about 50 feet from the pier end. The tug was then still hidden by the shed from any vessel approaching from the south close to the pier ends and such a vessel was likewise hidden from the tug. The giving of a slip whistle is required by the Inland Navigation Rules, Art. 18, Rule 5, 30 Stat. 100, 33 U.S.C.A. § 203, rule 5. The statute does not fix the precise time at which the signal shall be blown, nor the length of it. But the cases hold that when a vessel is proceeding from behind an obstruction she should herald her coming until clear of the obstruction. The Edouard Alfred, D.C., 261 F. 680; Edward J. Barton Lighterage Co. v. Davis, 2 Cir., 4 F.2d 999, 1000; The Cotopaxi, 2 Cir., 20 F.2d 568, 570; The Samson, 2 Cir., 93 F.2d 497, 498. We think the tug should have continued blowing her slip whistle at least until she had a clear view of the fairway beyond the pier shed. Such a precaution was particularly necessary because her master had reason to expect that a vessel might be near, since he had heard the Dalzell's one blast signal, though not the answering whistle. Even without such warning a master is charged with knowledge that vessels at times pass nearer to the pier ends than they ought. The Poling Bros. No. 2, 2 Cir., 62 F.2d 357, 358. A blast continued until the pier shed was passed might have been heard by the navigators of the Supply No. 4 although they were too inattentive to notice the shorter blast whose sound may have been somewhat muffled by the shed.

The speed with which the tug came out is in dispute, but as she never fully emerged from the slip and could not have gone forward more than about 100 feet after she sighted the approaching tanker, we will not charge her with fault in this regard. But because of her insufficient slip whistle and a deckhand who was not devoting his undivided attention to his duties as lookout she must share responsibility for the collision. Decree of dismissal reversed with directions to award the libellant an interlocutory decree for half damages.