## CITY OF NEW YORK v. THE E. F. MORAN, JR.

## THE SEAGATE.

### No. 16190.

District Court, E. D. New York.

Feb. 13, 1942.

William C. Chanler, Corp. Counsel, of New York City (George Seagrave Franklin and Martin Faust, both of New York City, of counsel), for libellant.

Burlingham, Veeder, Clark & Hupper, of New York City (Adrian J. O'Kane, of New York City, of counsel), for claimant.

ABRUZZO, District Judge.

The City of New York, as owner of the ferryboat "Seagate", has brought this libel against the steamtug "E. F. Moran, Jr.", owned by Tug Junior Moran, Inc., for damages sustained by the ferryboat "Seagate" on August 20, 1940.

On that date, the "Seagate" left the rack at full speed and proceeded up the slip, bound on her regular trip to St. George, Staten Island. On its port side was Pier 8, a covered pier running out to the end of the slip. Halfway up the slip, the ferryboat blew a long slip whistle. When about one hundred fifty (150) feet from the end of the slip, the captain of the "Seagate" observed over the top of the shed on Pier 8 the smokestack of a tug, which turned out to be the "E. F. Moran, Jr.", somewhere between Piers 7 and 8, proceeding in a northerly direction so that it would have to cut across the path of the ferryboat.

The "Seagate" immediately put her engines in reverse, with a jingle, and blew the alarm signal.

The tug "E. F. Moran, Jr.", responded with an alarm signal and also started to back.

The impetus of both vessels carried them forward and the bow of the tug struck the "Seagate" on her port side about thirty (30) feet from the bow (Rec. pp. 9, 32). The point of collision occurred about fifty-five (55) feet beyond the pier end when the ferryboat was only approximately half way out of the slip (Rec. pp. 9, 18, 24). This is the view of the acci-

dent as attested to by the libellant's witness.

The tug's version of the matter was given by her mate who was in charge of navigation. He testified that the tug had left Pier 5, about one thousand (1,000) feet below Pier 8 and steered a course about one hundred fifty. (150) feet off the pier end line, bound for Gowanus Bay, Brooklyn, New York (Rec. pp. 29, 30). She was proceeding at about four or five knots and when she was off the lower end of Pier 8 she first observed the ferryboat emerging from its slip without warning. The mate stated that the tug blew its alarm signal and reversed its engines and that the "Seagate" answered the alarm and apparently started to back. The tug swung to her right but could not avoid colliding with the "Seagate".

Scrutinizing the evidence and weighing the veracity of the respective witnesses, the circumstances involved in this action may be summed up as follows:

The "Seagate" left the rack at full speed and proceeded up the slip. To its port side was Pier 8, a covered pier, running out to the end of the slip. This prevented the "Seagate" from seeing vessels approaching in the fairway beyond the end of the pier; and vice versa, approaching vessels were prevented from observing the "Seagate" proceeding out of a blind slip.

The ferryboat sounded a long slip whistle of seven to ten seconds duration when she was half way up the slip.

As the "Seagate" left her slip, the tug "E. J. Moran, Jr.", was proceeding at a speed of approximately five knots per hour, fifty or sixty feet from the pier end line.

The ferryboat observed the smokestack of the steamtug over the top of the shed of Pier 8 when the "Seagate" was one hundred fifty (150) feet from the end of the slip. The slip whistle had ceased by that time. At this point, the danger signal was blown by the "Seagate" which was answered by the "E. J. Moran, Jr." and both vessels started to back. The momentum of the respective vessels carried them ahead and they collided.

It was the duty of the "Seagate" to continue sounding her slip whistle until she was beyond the obstruction of the covered pier and could be seen. Failure to do so is negligence on the part of the offending vessel.

In navigating fifty or sixty feet from the ends of the pier, the steamtug "E. J. Moran, Jr.", was guilty of shaving the pier ends, a fault for which she is liable.

The case at bar comes squarely within the purview of "The Supply No. 4", 2 Cir., 109 F.2d 101, 102. In that case, a tug was emerging from behind an obstruction and collided with a tanker proceeding up the river, shaving pier ends at undiminished speed. The opinion said:

"The faults of the Supply No. 4 are so clear as to require little discussion. She was shaving the pier ends at undiminished speed. This is enough to condemn her without considering other charges of fault found against her. The Newark, 2 Cir., 289 F. 801; Atlantic Lighterage Corp. v. The Jamestown, affirmed, 2 Cir., 71 F.2d 998; The Samson, 2 Cir., 93 F.2d 497.

* * * * * *

"But the tug was also at fault in respect to her slip whistle. Admittedly she ceased to sound it when the pilot house was about 50 feet from the pier end. The tug was then still hidden by the shed from any vessel approaching from the south close to the pier ends and such a vessel was likewise hidden from the tug. The giving of a slip whistle is required by the Inland Navigation Rules, Art. 18, Rule 5, 30 Stat. 100, 33 U.S.C.A. § 203, rule 5. The statute does not fix the precise time at which the signal shall be blown, nor the length of it. But the cases hold that when a vessel is proceeding from behind an obstruction she should herald her coming until clear of the obstruction. The Edouard Alfred, D.C., 261 F. 680; Edward J. Barton Lighterage Co. v. Davis, 2 Cir., 4 F. 2d 999, 1000; The Cotopaxi, 2 Cir., 20 F. 2d 568, 570; The Samson, 2 Cir., 93 F.2d 497, 498. We think the tug should have continued blowing her slip whistle at least until she had a clear view of the fairway beyond the pier shed."

The rule enunciated in "The Supply No. 4", supra, is applicable to the instant case. Both the ferryboat and the steamtug were at fault. Their respective negligence caused the collision. Consequently, the libellant is entitled only to half damages. A decree may be entered accordingly.