584 F.2d 1151
 12 ERC 1010
 Complaint of TUG OCEAN PRINCE, INC., and Red Star Towing &
Transportation Co., as Owner and Charterer of the Tug "Ocean
Prince", for Exoneration from or Limitation of Liability,
Plaintiffs-Third Party Plaintiffs-Appellees-Cross-Appellants,
v.
UNITED STATES of America, Third Party Defendant-Appellee.
UNITED STATES of America, Plaintiff-Appellant,
v.
PITTSTON MARINE TRANSPORT CORP., Defendant-Appellee,
Tug Ocean Prince, Inc. and Red Star Towing & Transportation
Co., Defendants-Appellees.
 Nos. 842, 901, 902, Dockets 77-6190, 6195.
 United States Court of Appeals,
Second Circuit.
 Argued May 24, 1978.
Decided Aug. 7, 1978.
 
 McHugh, Heckman, Smith & Leonard, New York City, for Pittston Marine Transport Corp.
 Healy & Baillie, New York City, for Tug Ocean Prince, Inc. and Red Star Towing & Transp. Co.
 Thomas J. Cahill, U. S. Atty., Gilbert S. Fleischer, Atty. in Charge Admiralty & Shipping Section, Washington, D. C., Janis G. Schulmeisters, Trial Atty., New York City, for United States of America.
 Before OAKES, Circuit Judge, BLUMENFELD, Senior District Judge,* MEHRTENS, Senior District Judge.**
 MEHRTENS, Senior District Judge:
 The oil-laden Barge New London, push-towed by the Tug Ocean Prince, struck a charted rock outside the navigable channel in the Hudson River, sustaining damage and causing a considerable oil spill. Tug Ocean Prince, Inc. and Red Star Towing & Transportation Co. (Red Star), the owner and charterer of the Tug Ocean Prince, petitioned for exoneration from or limitation of liability under 46 U.S.C. § 183 Et seq. in which proceeding Pittston Marine Transport Corp. (Pittston) filed claims for damage to the barge and loss of cargo. Red Star thereafter filed a third-party action against the United States of America (the United States), alleging that its fault caused the casualty. The United States counterclaimed against the tug and crossclaimed against the barge for the pollution cleanup expenses. Pittston crossclaimed against the United States for its damages and the United States counterclaimed against Red Star for the money spent for cleanup. The United States also filed a separate action against them for the cleanup costs in the civil pollution penalty under 33 U.S.C. § 1321. The actions were consolidated for trial. The trial court denied exoneration but granted limitation to the value of the tug. It further found that Pittston was not responsible for the oil spill and dismissed the United States' action against Pittston. The court also dismissed both Red Star's and Pittston's claims in the third-party action as well as Pittston's counterclaim against the United States in the action it instituted to recover the cleanup costs, limiting the tug's liability for pollution cleanup to $100 per gross ton under the provisions of 33 U.S.C. § 1321. Nobody is happy and everybody has appealed.
 The court below made detailed findings of fact and conclusions of law. The Ocean Prince v. United States, 436 F.Supp. 907 (S.D.N.Y.1977). The facts may be capsulated, enlarging upon them as need be in the discussion that follows.The Facts in the Court Below
 In examining Pittston's and the United States' contentions that the district court erred in holding that Red Star was entitled to limit its liability, we make plain at the outset that we accept the fact-findings made by the trial court except where they are inconsistent or, in our opinion, clearly erroneous.
 The Tug Ocean Prince has an overall length of 94.7 feet, a gross tonnage of 198 tons, and her deep draft was about 14 feet. She is pilothouse controlled, equipped with radar, a gyro-compass, a magnetic compass, and a searchlight. She did not have a pelorus or azimuth circle or other equipment with which to take visual bearings. The radar had relative graduations. With the cursor or cross hairs relative bearings could be taken. The tug's deck crew consisted of two pilots, Walter Reimer and John Kiernan, both Coast Guard licensed, and two deckhands, one assigned to each watch. Each pilot and deckhand stood six-hour watches. The deckhands had other duties and were often sent below for coffee, all of which was well known to Red Star's Vice President of Operations.
 The tank Barge New London, of 1665 gross tons, has an overall length of 295 feet, and was drawing 12 feet. In her stern was a pushing notch where the bow of the tug fits snugly. The tug was secured to the barge with steel cables and synthetic lines. Steering and propulsion were supplied by the tug.
 Operating as a unit, the tug and barge were 385 feet long, of 1863 gross tons.
 Reimer had been employed by Red Star for about one and one half years while the Ocean Prince operated in southern waters. In southern waters Reimer had acted as her captain and mate, but when the Ocean Prince came north at the beginning of the year Reimer left for vacation.
 Kiernan was employed by an associated company as tug captain. He had extensive experience on the Hudson River, but, except for this voyage, had never worked for Red Star. On February 1, 1974, Kiernan joined the Ocean Prince as mate.
 On February 2nd the permanent captain of the Ocean Prince left and thereafter Reimer arrived. Red Star intended Kiernan to be captain and Reimer to be mate, but Red Star's dispatcher, who assigned the Ocean Prince to the job, did not communicate this information to Kiernan or to Reimer, and neither had anyone else, nor was the fact that Reimer had never piloted on the Hudson River communicated to Kiernan. As a result, Kiernan and Reimer each assumed that he was the mate and the other the captain. Reimer, although he had no experience on the Hudson River, did not check the navigation aids on board or examine the Light List or the Coast Pilot very carefully.
 About one and three-quarters miles north of Bear Mountain Bridge lies a large submerged rock formation on the west side of the channel, which is clearly indicated on the chart and marked in winter months by the unlighted black can buoy "25".
 The Light List warns the pilot not to rely on floating aids to navigation; that all buoys should be regarded merely as warnings or guides; that whenever, if possible, a vessel should be navigated by bearings or angles on fixed objects on shore and by soundings rather than reliance on buoys; that the lighted buoy "25" is replaced by an unlighted can buoy from December 15 to April 1; and that the fixed light "27" on Con Hook Island is on a black skeleton tower 46 feet above water.
 The Coast Pilot advises pilots that during the ice season aids to navigation are covered or dragged off station by moving ice; that, however, the river is well marked by lights along the shore and, most important, that with respect to the rock marked by buoy "25", the rock has a depth of seven feet, and with a fair current there is a tendency to set toward the rock; caution is advised.
 At about 1800 hours (6:00 P.M.) Red Star's dispatcher advised the Ocean Prince to proceed to Exxon Dock to take the Barge New London to Kingston. Nothing was said about who would be the captain or Reimer's lack of experience on the Hudson River. The Ocean Prince proceeded there, was secured to the barge, after which Reimer went below and Kiernan continued on watch. At 2330 hours (11:30 P.M.) Reimer came to the pilothouse and relieved Kiernan of the watch. The tug and barge continued northward up the Hudson River past Peekskill and approached Bear Mountain Bridge. The tide was ebbing. There was ice in the river and visibility was about two miles with snow flurries. The tug was proceeding at a speed of about six knots over the bottom. The radar was operating and a chart for the area was in the wheelhouse. When the tug and barge passed under the bridge, Reimer sent the deckhand down to the galley to get coffee, remaining by himself in the wheelhouse.
 Although able to see both shore lines of the river, Reimer began using the tug's searchlight to look for buoy "25" on the lefthand side of the channel. Unable to see it, he reduced the engine speed to "half, maybe less" and continued searching for the buoy. He never saw the light on Con Hook Island ahead, although it was visible from a position off Fort Montgomery or Town of Manitou about 1.5 miles south of the light and one mile south of the point of striking. The deckhand returned to the wheelhouse about the time that the barge struck the rock on her port side and to the left of the navigational channel. Oil escaped from the damaged cargo tanks, creating a serious pollution problem. Reimer never saw the can buoy. Kiernan came to the wheelhouse shortly after the striking, saw the Con Hook Island light ahead and observed the can buoy on the starboard beam of the tug 50 to 75 feet away. Reimer was very upset and Kiernan took over the wheel. He turned the tug and barge around and headed south to the Dayline Pier. After turning around Kiernan observed the lights on the Bear Mountain Bridge about two miles away.
 The Limitation of Liability
 The district court held that the casualty resulted from errors of navigation and management on board the tug, not within Red Star's privity and knowledge, and that, therefore, its liability was limited to the value of the tug and her pending freight and that Red Star's liability to the United States was subject to the tonnage limitation contained in 33 U.S.C. § 1321(g).
 In a limitation proceeding such as this, the burden of proof as to the absence of privity or knowledge is on the petitioners, Red Star. Coryell v. Phipps, 317 U.S. 406, 63 S.Ct. 291, 87 L.Ed. 363 (1943). It is the owner's duty to use due and proper care to provide a competent master and crew and to see that the ship is seaworthy; any loss occurring by reason of fault or neglect in these particulars is within his privity. Teeracciano v. McAlinden Construction Co., 485 F.2d 304 (2d Cir. 1973); Re Reichert Towing Line,251 F.2d 214 (2d Cir.), Cert. denied, 248 U.S. 565, 39 S.Ct. 9, 63 L.Ed. 424 (1918).
 Seaworthiness is a relative term depending upon its application to the type of vessel and the nature of the voyage. The general rule is that the vessel must be staunch, strong, well equipped for the intended voyage and manned by a competent and skillful master of sound judgment and discretion. The Niagara v. Cordes, 62 U.S. (21 How.) 7, 16 L.Ed. 41 (1859); The Framlington Court, 69 F.2d 300, 304 (5th Cir.), Cert. denied, 292 U.S. 651, 54 S.Ct. 860, 78 L.Ed. 1500 (1934); Adams v. Bortz, 279 F. 521 (2d Cir. 1922); Northern Commercial Co. v. Lindblom, 162 F. 250 (9th Cir. 1908). The burden to prove seaworthiness and the exercise of due diligence to make the ship seaworthy is upon the vessel owner or operator. Teeracciano v. McAlinden Construction Co., supra. Red Star had a non-delegable duty to provide a qualified master and crew for the intended voyage. Boudin v. Lykes Brothers Steamship Co., 348 U.S. 336, 75 S.Ct. 382, 99 L.Ed. 354 (1955); Petition of the United States, 178 F.2d 243, 252 (2d Cir. 1949). See, Admiral Towing Co. v. Woolen, 290 F.2d 641, 646 (9th Cir. 1961); Navegacion Castro Riva v. The M. S. Nordholm, 178 F.Supp. 736, 741, n. 19 (E.D.La. 1959), Aff'd, 287 F.2d 398 (5th Cir. 1961). If then, the Ocean Prince was manned by an inadequate crew, Red Star's duty as shipowner was breached on either the theory of negligence or that of unseaworthiness. Incompetence of the navigator makes the vessel unseaworthy. Empire Seafoods, Inc. v. Anderson, 398 F.2d 204 (5th Cir.), Cert. denied, 393 U.S. 983, 89 S.Ct. 449, 21 L.Ed.2d 444 (1968).
 The more restricted the operation in which a vessel is engaged the greater will be the degree of control which the corporate owner will be required to exercise over master, crew and subordinate shoreside employees. Avera v. Florida Towing Co., 322 F.2d 155 (5th Cir. 1963); Admiral Towing Co. v. Woolen, supra; G. Gilmore & C. Black, The Law of Admiralty (2d Ed. 1957) at 704.
 Red Star knew the conditions that would be encountered on a nighttime voyage from Bayonne, New Jersey to Kingston, New York during the ice season. Specifically, they knew or should have known that the United States Coast Guard during the ice season had removed the lighted buoy usually positioned south of Con Hook and replaced it with an unlighted can buoy; that buoys are likely to be covered or dragged off station by moving ice; that buoy "25" was located in an area which is susceptible to ice accumulation; and that these conditions result in obscuring of the buoy. Such conditions did in fact exist and required Red Star to exercise such reasonable care and maritime skill as prudent navigators employ in similar circumstances. Red Star knew that Reimer was totally unfamiliar with the Hudson River and knew or should have known that to pilot the tug and barge safely, it was necessary to furnish a competent captain and, if proper precaution or special circumstances required it, a lookout.
 The district court held Red Star negligent but found that the casualty occurred without Red Star's privity and knowledge. In reaching its conclusion the district court held that Red Star had exercised the high degree of care required by complying with the customary practice of having at least one of the two pilots with experience on the waters to be traversed aboard, and to be available to assist the other when necessary or requested.
 The district court clearly erred in accepting as a proper standard in this case the accepted practice in the tugboat industry of dispatching a tug to an area in which one of the pilots had no experience whatsoever so long as the other pilot on board had experience in the area and that it was customary practice aboard tugboats for Kiernan to stand the watch with Reimer if asked.
 The rule which has been supported generally by most of the authorities is that conformity to custom is not in itself the exercise of due care. Custom and usage do not justify negligence. A party cannot by his own continued negligence establish a custom by which he is exempt from liability; nor is legal responsibility for negligence mitigated by the fact that others had also been negligent. Methods employed in any trade, business or profession, however long continued, cannot avail to establish as safe in law that which is dangerous in fact. See Annot., 77 A.L.R.2d 1327 (1961).
 In The T. J. Hooper, 60 F.2d 737, 740 (2d Cir. 1932), Judge Learned Hand said:
 Indeed in most cases reasonable prudence is in fact common prudence; but strictly it is never its measure; a whole calling may have unduly lagged in the adoption of new and available devices. It never may set its own tests, however persuasive be its usages. Courts must in the end say what is required; there are precautions so imperative that even their universal disregard will not excuse their omission. (Citations omitted).
 In Troupe v. Chicago, Duluth & Georgian Bay Transit Co., 234 F.2d 253, 260 (2d Cir. 1956), Judge Waterman, in an action predicated upon negligence under the Jones Act for unseaworthiness under the general maritime law, stated:
 * * * While the customary practice of the industry is relevant and admissible, the defendant's standard of care in a negligence action is not limited to complying with usual practices in the industry or trade. Wabash R. Co. v. McDaniels, 1883, 107 U.S. 454, 460-461, 2 S.Ct. 932, 27 L.Ed. 605; Poignant v. United States, 2 Cir., 1955, 225 F.2d 595; Uline Ice, Inc. v. Sullivan, 1950, 88 U.S.App.D.C. 104, 187 F.2d 82; The T. J. Hooper, 2 Cir., 1932, 60 F.2d 737.
 In June T., Inc. v. King, 290 F.2d 404, 406 (5th Cir. 1961), the court, in holding that even though it was usual and customary to have a two-man crew, nevertheless the shrimper was unseaworthy because a two-man crew was insufficient, stated:
 * * * What is customary in a trade may be evidence of due care here the reasonable fitness element on the concept of seaworthiness but it is not the legal measure of the duty. The T. J. Hooper, 2 Cir., 1932, 60 F.2d 737, 1932 A.M.C. 1175; Troupe v. Chicago, Duluth & Georgian Bay Transit Co., 2 Cir., 1956, 234 F.2d 253, 260, 1956 A.M.C. 1367; Universe Tankships, Inc. v. Pyrate Tank Cleaners, Inc., D.C.S.D.N.Y.1957, 152 F.Supp. 903, 918, 1957 A.M.C. 1436; 38 Am.Jur., Negligence, § 34; Schlichter v. Port Arthur Towing Co., 5 Cir., 1961, 288 F.2d 801.
 In Burgess v. M/V Tamano, 564 F.2d 964, 981 (1st Cir. 1977), the court, in imposing liability upon the owners of a supertanker for the government's cleanup costs, stated:
 * * * It was no sufficient answer that it was customary to enter at night, and that the Coast Guard had not forbidden it. Texas & Pac. Ry. v. Behymer, 1903, 189 U.S. 468, 470, 23 S.Ct. 622, 47 L.Ed. 905; The T. J. Hooper, 2 Cir., 1932, 60 F.2d 737, 740 (L. Hand, J.), Cert. denied, 287 U.S. 662, 53 S.Ct. 220, 77 L.Ed. 571; Restatement, ante, § 33; Prosser, ante, § 33. . . .
 
 
 1
 As competent he might be in southern waters, Reimer, who was totally unfamiliar with Hudson River waters during the ice season, was not competent to take over, as a pilot or tug steerer, a tug and oil-loaded barge with a combined total of over 1800 gross tons. Red Star's management knew of Reimer's lack of experience on the Hudson River, knew of the conditions to be encountered, knew that he would stand night watches, clearly failed in its duty to exercise due diligence and sent out a ship unseaworthy because not properly manned under the existing conditions.
 
 
 2
 Neither was the fact that Kiernan, an experienced pilot, would have taken over the wheel, if asked, a sufficient excuse. Under this concept, if carried far enough, Red Star could excuse itself from liability even though an inexperienced, incompetent deckhand had been at the wheel, so long as he could have called a competent pilot.
 
 
 3
 In arriving at its conclusion the district court rejected the case of The Lady Pike, 88 U.S. (21 Wall.) 1, 22 L.Ed. 499 (1874), and adopted as "modern authority" The Temple Bar, 137 F.2d 293 (4th Cir. 1943).
 
 
 4
 In The Lady Pike, supra, the Supreme Court, with respect to pilots, laid down the following rule:
 
 
 5
 Ignorance of the danger before them is no sufficient excuse, as the owner appoints the master and is bound to select one of competent skill and knowledge, to transport goods and merchandise shipped on board in safety, which necessarily imposes the obligation to employ a master mariner who knows enough about the route to avoid the known obstructions and to choose the most feasible track for his route. Knowledge of the kind, in river navigation, is peculiarly essential, as the current frequently shift from one side towards the other, and the track of navigation is often obstructed by snags, sandbars, and shoals, which no degree of skill would enable the mariner or pilot to avoid without a prior knowledge of their existence.
 
 
 6
 The next year in Atlee v. New York Union Packet Company, 88 U.S. (21 Wall.) 389, 396, 22 L.Ed. 619 (1875), the court stated:
 
 
 7
 * * * (T)he pilot of a river steamer, like the harbor pilot, is selected for his personal knowledge of the topography through which he steers his vessel. * * * He must know where the navigable channel is, in its relation to all these external objects, especially in the night. He must also be familiar with all dangers that are permanently located in the course of the river, as . . . sunken rocks . . . All this he must know and remember and avoid . . .
 
 
 8
 These decisions are still viable insofar as the standards they set for inshore piloting and are applicable here. The district court expressly recognized the difference between inshore piloting and ocean navigation, but erroneously adopted and applied the standards set out in The Temple Bar, supra, dealing with an ocean-going vessel on a foreign voyage, which does not set standards for inshore pilots. The standards set out in The Lady Pike, supra, and in Atlee v. New York Union Packet Co., supra, relating to inshore pilots have not lost any of their strength; they are not moribund and their eulogy has not been delivered.
 
 
 9
 Counsel has not cited, and we cannot find a reported case, where, as here, there was a complete failure by the shipowner to dispatch a vessel without appointing a captain. Because Red Star had a non-delegable duty to provide a qualified captain and crew, it seriously failed in that duty by sending the Ocean Prince on that trip without appointing someone (Kiernan or Reimer) as captain in command.
 
 
 10
 The district court further found that it was the captain's duty to know the experience and qualifications of the mate, but here we had no captain. Neither Kiernan nor Reimer had been told who was the master. Kiernan had never worked for Red Star before and was not told, nor did he know, of Reimer's total lack of experience on the Hudson, all of which the district court found to be "an unfortunate set of circumstances", creating confusion. Red Star's management alone was responsible for this "unfortunate set of circumstances." If it had intended Kiernan to be captain, it should at least have told him that he was captain and that Reimer had no experience on the river. Red Star should not have permitted this situation to develop, that is, directing the tug to make up to a loaded oil barge, and to proceed at night through waters that required special knowledge of the conditions that would be met, without clearly defining or advising its personnel as to which one of them had the ultimate responsibility of command. For Red Star to do so was clearly a negligent act on the part of Red Star's management, and Red Star's management was not exercising the character of care required.
 
 
 11
 The district court further found that "Even without the warning in the Coast Pilot, a mariner familiar with the river would not have relied on the buoy at this time of year under the existing conditions"; that "Reimer was well aware that he was unprepared to navigate under the difficult conditions which were rapidly developing", that "With proper use of radar, Reimer could have gotten a radar range from the Bear Mountain Bridge with reasonable accuracy. With a radar range off Bear Mountain Bridge and a visual bearing on Con Hook Light it would have been possible to construct a danger bearing to keep the vessel off the rock. However, since the Tug, as most tugs, was not equipped with a gyro repeater or a pelorus it was difficult to take accurate visual bearings"; and that "Had Kiernan been brought to the wheel house, it is very likely he would have quickly detected that they were to the west of the channel and that the buoy was obscured by drifting ice."
 
 
 12
 The grounding of the Barge New London did not occur because of a single separate incident. It was the result of an accumulation of acts, all of which originated with Red Star's management, resulting in an easily foreseeable casualty. Where, as here, Red Star by prior action or inaction set into motion a chain of circumstances which may be a contributing cause even though not the immediate or proximate cause of a casualty, the right to limitation is properly denied. Waterman Steamship Corp. v. Gay Cotton, 414 F.2d 724 (9th Cir. 1969). Red Star's actions must be considered as causative when establishing fault in the grounding of the barge, and as such they come within the privity and knowledge of Red Star.
 
 
 13
 In Nuccio v. Royal Indemnity Co., 280 F.Supp. 468, 469 (E.D.La.1968), a proceeding to recover for injuries sustained when the boat on which libelant was a guest passenger collided into the bank of the bayou, the court stated:
 
 
 14
 It is hornbook law that when a moving vessel strikes a stationary object an inference of negligence arises and the owner of the vessel then has the burden of rebutting such inference. This respondent has failed to do.
 
 
 15
 The defense of limitation of liability is also unavailable to respondent because this accident occurred within the full privity of its assured. When respondent's assured entrusted the operation of the Pintail to an inexperienced person, he destroyed any defenses which he might have had relative to limitation of liability.
 
 
 16
 On appeal, Nuccio v. Royal Indemnity Co., 415 F.2d 228, 229 (5th Cir. 1969), the lower court was affirmed with the statement that:
 
 
 17
 Once it is determined that Arceneaux was negligent and therefore liable for Nuccio's injuries, Royal's contention that the trial court erred in failing to limit liability to the value of the Pintail becomes frivolous. In order to limit the owner's liability, the injury must occur without his "privity or knowledge." This phrase is often defined as "complicity in the fault that caused the accident." Where the owner's negligent act caused the alleged injury as found by the trial court, clearly all of the requirements of "privity" are satisfied.
 
 
 18
 The reasoning of that case is equally applicable here where Red Star's management entrusted the operation of the Ocean Prince to an inexperienced pilot.
 
 
 19
 Accepting as we do all of the district court's consistent fact findings, we nonetheless conclude in the context of the uncontradicted facts of this record that the casualty occurred as a result of negligence and unseaworthiness within the privity and knowledge of Red Star; that the order granting limitation of liability should be vacated; and that the court should have entered an order denying limitation of liability.
 
 The Failure to Post a Lookout
 
 20
 The district court, while finding that "Reimer failed to post a lookout when the conditions were such that the same was required," also found that "There was no proof whatever that a lookout forward could have observed the ice stranded buoy," and then it concluded that "the failure to post a lookout cannot be said to have contributed to the collision." This we find to be clearly erroneous because a lookout of suitable experience and competence, properly stationed, and vigilantly employed in the performance of his duty would have seen and reported the Con Hook Light in ample time to avoid the casualty.
 
 Title 33, U.S.C. § 221 reads as follows:
 
 21
 Nothing in these rules shall exonerate any vessel, or the owner or master or crew thereof, from the consequences of any neglect to carry lights or signals, or of any neglect to keep a proper lookout, or of the neglect of any precaution which may be required by the ordinary practice of seamen, or by the special circumstances of the case.
 
 
 22
 The importance of a lookout was stated by the Supreme Court in The Ariadne, 13 Wall. 475, 80 U.S. 475, 478-79, 20 L.Ed. 542 (1861), thus:
 
 
 23
 The duty of the lookout is of the highest importance. Upon nothing else does the safety of those concerned so much depend. * * * It is the duty of all courts charged with the administration of this branch of our jurisprudence, to give the fullest effect whenever the circumstances are such as to call for its application. Every doubt as to the performance of the duty, and the effect of non-performance, should be resolved against the vessel sought to be inculpated until she vindicates herself by testimony conclusive to the contrary.
 
 
 24
 The lookout rule applies, of course, to tugboats. The Supply No. 4, 109 F.2d 101 (2d Cir. 1940). It is also established that the pilot steering a tug and tow is not a proper lookout. Dwyer Oil Transport Co. v. The Edna M. Matton, 255 F.2d 380 (2d Cir. 1958); The Supply No. 4, supra; Oil Transfer Corp. v. Diesel Tanker F. A. Verdon, Inc., 192 F.Supp. 245 (S.D.N.Y.1960).
 
 
 25
 Reimer was alone in the wheelhouse some 1750 yards south of the location of the charted rock when he experienced difficulty in locating the buoy. Despite being unable to locate it visually or with the radar, he did not direct the deckhand to serve as a lookout. The uncontradicted evidence shows that Con Hook Light was visible about 0.62 miles or 1300 yards south of the rock marked by buoy "25". From that point it would have taken the tug and barge 10 to 12 minutes to reach the rock all while the Con Hook Light and the shore line were visible.
 
 
 26
 The Con Hook Light is on top of a tower 46 feet above mean low water. It is visible at the rock (buoy "25"), is visible off Mystery Point, at Manitou, and is visible further south. The chart shows that there is a straight line of sight from Con Hook Light all the way down to the center of the Bear Mountain Bridge.
 
 
 27
 This is where the failure to have a proper lookout is important and significant and not his ability or inability to see the buoy. Once Con Hook Light was sighted, a pilot could take bearings forward to that light and aft to Bear Mountain Bridge, establishing a line of position and a danger bearing so that the tug's position on one side would assure the tug and barge being in safe waters, while a position on the other side would clearly indicate a hazardous situation. Reimer had at least 10 minutes and probably more time during which the Con Hook Light was visible, yet he had no lookout and did not notice it himself. Even though a lookout did not see the ice stranded buoy, it would be a matter of pure speculation to say that a proper lookout would not have seen and reported Con Hook Light.
 
 
 28
 It seems clear that under the circumstances existing the ordinary practice of seamen required the keeping of a proper lookout at that time and place. Of course, in order to take proper precautions Reimer would first have to see Con Hook Light. He did not see it, and there was no lookout to report it, as the person who would have been the lookout was getting coffee. This was the usual practice condoned by Red Star's Vice President of Operations.
 
 
 29
 The failure to post a lookout when the conditions were such that the same was required was not only negligent and contrary to good practice, it was also a violation of a statutory duty. Such a violation invokes The Pennsylvania rule. When a ship violates a statutory rule intended to prevent casualties "The burden rests upon the ship of showing not merely that her fault might not have been one of the causes, or that it probably was not, but that it could not have been. Such a rule is necessary to enforce obedience to the mandate of the statute." The Pennsylvania v. Troupe, 86 U.S. (19 Wall.) 125, 136, 22 L.Ed. 148 (1874); Ira S. Bushey & Sons, Inc. v. United States,172 F.2d 447 (2d Cir. 1949). The "Pennsylvania rule" is still alive and well today. That rule's vitality and force were not in any degree affected by United States v. Reliable Transfer Co., 421 U.S. 397, 95 S.Ct. 1708, 44 L.Ed.2d 251 (1975), which overruled The Pennsylvania only in so far as it abolished the Mutual Fault-Equal Contribution rule and substituted a new rule requiring liability for collision damage to be allocated proportionately to the comparative degree of fault.
 
 
 30
 In this case we hold that the district court's finding that failure to post a lookout cannot be said to contribute to the casualty is in the light of the uncontradicted facts and The Pennsylvania rule clearly erroneous and that Red Star failed to overcome its burden of showing that by all reasonable probabilities its failure to require a lookout did not contribute to the cause of the collision. We further conclude that a finding of lack of privity or knowledge on Red Star's part is also clearly erroneous.
 
 
 31
 This alone is enough to deny Red Star limitation of liability.Government's Responsibility for the Grounding
 
 
 32
 We need not pause long to conclude that the district court properly held that the United States should not be found liable under the Suits in Admiralty Act, 46 U.S.C. §§ 741-52. There was substantial evidence from which the district court found that during the ice season the can buoy is the best practical floating aid for the site under present technology; that a fixed tower on the rock, the base of which would be in 7 feet of water, would be damaged or destroyed by ice, and that it cannot be said that the negligence, if any, of the United States in not establishing more effective aids to navigation was the proximate cause of the grounding.
 
 
 33
 We therefore affirm the district court's dismissal of the claims over against the United States.
 
 
 34
 Red Star's Liability to the United States for Pollution Cleanup Costs
 
 
 35
 The district court limited Red Star's liability to the United States, for pollution cleanup costs, to $100 per gross ton of the Tug Ocean Prince, or $19,800.00.
 
 
 36
 The United States insists that Red Star's actions, as a whole, constitute willful negligence or willful misconduct within its privity and knowledge.
 
 
 37
 The United States also contends that even if this not be so, the district court should have applied the "flotilla doctrine" and used the combined tonnages of the tug and barge, as a unit, in assessing pollution cleanup damages against Red Star.
 
 
 38
 If the United States is correct, then Red Star's liability for the cleanup costs would be $186,300.00 instead of $19,800.00.
 
 
 39
 The district court held that the cause of the grounding was not a fault within the privity and knowledge of Red Star and, therefore, never reached the question of what constituted willful negligence or willful misconduct. Because we hold that the Ocean Prince was unseaworthy at the inception of the voyage and that Red Star was guilty of negligence within its privity and knowledge, we must decide whether Red Star's actions constituted willful negligence or willful misconduct and, if it did not, whether the "flotilla rule" should be applied.
 
 
 40
 Increased oil pollution of the seas is a natural consequence of the world's increased dependence on oil to satisfy industrial needs and basic energy requirements. Each year approximately 60% Of the world production of oil is transported by sea. About 1/10 of 1% Of this amount is lost at sea. This amount is divided between tank cleaning operations wherein "slops" are dumped overboard and accident-related spills.[1] The advent of the supertanker has created the danger of larger oil spills, such as occurred as a result of the strandings of The Torrey Canyon and the Ocean Eagle. Dumping and accidental spilling of oil constitutes a major pollution threat to the water resources of the nation. It can destroy or limit marine life, ruin wild life habitats, kill birds, limit or destroy the recreational value of ocean beaches, lake shores and river stretches, contaminate water supplies and create fire hazards. Congress has repeatedly indicated its high regard for our water quality and, conversely, its disdain for its pollution. United States v. Ira S. Bushey & Sons, Inc., 346 F.Supp. 145 (D.Vt.1972).
 
 
 41
 The first statute specifically dealing with oil discharges was the Oil Pollution Act of 1924 (33 U.S.C. §§ 431-437), intended to protect the nation's coastal waters from vessel discharges. Congress next passed the 1948 Water Pollution Control Act (33 U.S.C. § 466), which was amended in 1956 and 1961. In 1965 Congress enacted the Water Quality Act establishing water quality standards for interstate waters. The Clean Water Restoration Act of 1966 (33 U.S.C. § 466) amended the Oil Pollution Act of 1924.
 
 
 42
 The 1966 Act was superseded by the Water Quality Improvement Act of 1970 (33 U.S.C. § 1161), a more comprehensive Act wherein Congress declared the policy to be "that there should be no discharges of oil . . . into or upon the waters of the contiguous zone" (33 U.S.C. § 1321). The 1970 Act, as amended by the Federal Water Pollution Control Act of 1972 (33 U.S.C. § 1321), is the law applicable to this case. This Act adopts the same measure of damage as the 1924 Oil Pollution Act; however, the defenses are more limited, reflecting a strict liability rather than a negligent standard.
 
 
 43
 The 1970 Water Quality Improvement Act, incorporated into and modified by the Federal Water Pollution Control Act of 1972, is a comprehensive plan attempting to expedite oil pollution cleanup and to establish a workable scheme for limiting and distributing liability. As amended, the Act prohibits any discharge of oil or other hazardous substances into or upon the navigable waters of the United States and adjoining shorelines or into or upon waters of the contiguous zone, except where permitted under Article IV of the International Convention for the Prevention of Pollution of the Seas by Oil, as amended, or where permissible by presidential regulation (33 U.S.C. § 1321).
 
 
 44
 Summarized, the Act provides that in cases where a discharge of oil is not permissible under the Act, the owner or operator of the applicable vessel or onshore or offshore facility shall be liable to the United States for cleanup costs, except if the owner or operator proves that the discharge was caused by Act of God, Act of War, negligence by the United States, or an act or omission of a third party whether or not negligent or by any combination of those causes. It provides that "Notwithstanding any other provision of law, liability of vessel owners to the United States for the actual cost of removing oil or hazardous substances discharged is limited to $100 per gross ton or $14,000,000.00, whichever is lesser," and that limitation in the above amounts will be denied where the United States can show that the discharge was the result of "willful negligence or willful misconduct within the privity and knowledge of the owner" (33 U.S.C. § 1321(f)(1)). With respect to third party liability it provides that where the owner or operator of a vessel or onshore or offshore facility proves that a discharge was caused by an act or omission of a third party, the third party shall be liable to the United States and contains the same penalties and defenses as set out in subsection (f) dealing with the actual spiller or discharger.
 
 
 45
 The statute is not a model of clarity. In the absence of clarifying case law or legislative history on point, one can only speculate as to the meaning of the "Notwithstanding any other provision of law" clause. With respect to federal cleanup costs, it is uncertain whether Congress intended the Federal Water Pollution Control Act to supersede the Limitation of Liability Act or whether it intended both Acts to be read together so as to provide the greatest relief to the United States. Because the two statutes serve different purposes and differ substantially on crucial issues, in all probability the United States is limited to recover under the Federal Water Pollution Control Act, which does not deny limitation for cleanup costs unless the discharge is the result of willful negligence or willful misconduct within the privity and knowledge of the owner.
 
 
 46
 As used in the Water Pollution Prevention and Control Act, 33 U.S.C. § 1251 Et seq., and specifically as used in section 1321, Oil and Hazardous Substance Liability, the phrases "willful misconduct" and "willful negligence" have not been defined. Counsel have not indicated any cases in which the terms have been explained, and our research has disclosed none. The phrase "willful misconduct", however, has been defined by this court with reference to cases arising under the Warsaw Convention, 49 Stat. 3000, Article 25(1), which excludes any limitation of liability if the damage is caused by the carrier's willful misconduct.
 
 
 47
 In those cases arising under the Warsaw Convention, this circuit has established the following criteria for a finding of willful misconduct: an act, intentionally done, with knowledge that the performance will probably result in injury, or done in such a way as to allow an inference of a reckless disregard of the probable consequences. Pekelis v. Transcontinental & Western Air, 187 F.2d 122 (2d Cir.), Cert. denied, 341 U.S. 951, 71 S.Ct. 1020, 95 L.Ed. 1374 (1951). If the harm results from an omission, the omission must be intentional, and the actor must either know the omission will result in damage or the circumstances surrounding the failure to act must allow an implication of a reckless disregard of the probable consequences. Pekelis v. Transcontinental & Western Air, supra. The knowledge required for a finding of willful misconduct is that there must be either actual knowledge that the act, or the failure to act, is necessary in order to avoid danger, or if there is no actual knowledge, then the probability of harm must be so great that failure to take the required action constitutes recklessness. Berner v. British Commonwealth Pacific Airlines, Ltd., 346 F.2d 532 (2d Cir. 1965); Pekelis v. Transcontinental & Western Air, supra.
 
 
 48
 In this case, the questions are whether Red Star's omissions, specifically its failure to inform Kiernan of Reimer's unfamiliarity with the river, its failure to appoint a captain, and its failure to require a lookout under the circumstances, were done intentionally, and whether Red Star knew such a combination of omissions would likely result in damage; or whether, if Red Star did not have actual knowledge, it should have recognized the probable consequences, and that, therefore, the failure to act constituted a reckless disregard of those probable consequences. We think it did.
 
 
 49
 With regard to whether the failure to act was intentional, Keenan, Red Star's night dispatcher, knew the facts and determined that the tug was suitable for the voyage. Furthermore, even after the tug had left port, any one of Red Star's dispatchers could have called Kiernan to inform him of Reimer's inexperience on the river. Given that Keenan knew of Reimer's unfamiliarity, that the day dispatcher had told Keenan that Kiernan was to be captain, that a ship-to-shore radio was available to communicate this information, even if Keenan had merely forgotten at the time of assigning the Ocean Prince to the trip, and had said nothing to either Kiernan or Reimer, Keenan's omission and his failure to correct it must be considered intentional. Koninklijke Luchtvaart Maatschappij N.V. KLM v. Tuller, 110 U.S.App.D.C. 282, 292 F.2d 775, Cert. denied, 368 U.S. 921, 82 S.Ct. 243, 7 L.Ed.2d 136 (1961). Additionally, we have previously held (as the lower court expressly found) that a lookout was required under the existing circumstances, and that failure to post a lookout was a violation of a statutory duty. Since Red Star was aware of the practice of sending the mate for coffee, failed to take any steps to alter that practice, and knew the absence of a lookout was unsafe under the existing conditions, its failure to require the lookout posted must also be considered intentional. American Airlines v. Ulen, 87 U.S.App.D.C. 307, 186 F.2d 529 (1949).
 
 
 50
 The circumstances surrounding this trip warrant an inference that Red Star acted in reckless disregard of the probable consequences. Red Star's management failed to designate the captain of the tug and failed to inform Kiernan of Reimer's unfamiliarity with the river. Red Star knew that deckhands were sent below for coffee, thereby eliminating them as a lookout, yet failed to take any steps to halt this practice. Given the conditions at the time of the accident the ice along the bank, the possibility of the buoys having been moved by the ice, the darkness, and the ebbing tide all of which Red Star knew or should have known, Red Star's failure to act allows an inference of a reckless disregard of the probable consequences.
 
 
 51
 It must be made clear that the determination of willful misconduct does not rest solely because of Reimer's unfamiliarity with the river, Cf. Goepp v. American Overseas Airlines, 281 App.Div. 105, 117 N.Y.S.2d 276 (1952), Aff'd., 305 N.Y. 830, 114 N.E.2d 37, Cert. denied, 346 U.S. 874, 74 S.Ct. 124, 98 L.Ed. 382 (1953), nor does it attach necessarily because of any navigational mistakes, Cf. Grey v. American Airlines, 227 F.2d 282 (2d Cir. 1955), Cert. denied, 350 U.S. 989, 76 S.Ct. 476, 100 L.Ed. 855 (1956). This case is unlike Grey v. American Airlines, supra, in which the court found that even if there had been pilot error, that fact, by itself, did not necessarily constitute willful misconduct. It is, rather, the combination of factors which together indicate a probable consequence of damage resulting from several failures to act, and by continuing to fail to act in the face of that probability, that indicates a reckless disregard of the consequences. While any one of the faults of Red Star alone, even within privity, may not constitute "willful misconduct", on the entire record the various inactions and gross disregard of the potential harm amount, in our opinion, to willful misconduct within the meaning of the statute. Otherwise, it would be difficult to imagine what would be necessary to make a tug company liable for the costs of cleaning a negligent oil spill save an admission of an actual intent to do so, and would extend to the tugboat industry an almost absolute exemption from liability for pollution cleanup costs.
 
 
 52
 In summary, we hold that the order of the district court that Red Star is entitled to limit liability with respect to Pittston's claim and also the United States' claim for pollution cleanup costs should be vacated and that an order be entered denying Red Star the right to such relief; directing the entry of judgment in favor of Pittston and the United States for the amount of their damages; and that the district court's judgment in all other respects be affirmed.
 
 
 53
 Reversed in part, affirmed in part, and remanded for further proceedings consistent with this opinion.
 
 
 
 *
 Sitting by special designation from the District of Connecticut
 
 
 **
 Sitting by special designation from the Southern District of Florida
 
 
 [1]
 See Charter, Sutherland & Porricelli Quantitative Estimates on Petroleum to the Oceans (1973), where it is estimated that each year operational discharges account for 1,370,000 tons of oil while vessel accidents account for about 350,000 tons